THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CHARLES EDWARD HUTSON, JR., Defendant-Appellant.

Fifth District   No. 5—84—0050

Opinion filed June 28, 1985.

Randy E. Blue and John R. Abell, both of State Appellate Defender's
Office, of Mt. Vernon, for appellant.

Randy Patchett, State's Attorney, of Marion (Kenneth R. Boyle, Stephen E. Norris, and Vito A. Mastrangelo, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE KASSERMAN delivered the opinion of the court:

The defendant, Charles Edward Hutson, Jr., was indicted on two counts of aggravated battery in the circuit court of Williamson County. In count I defendant was charged with committing the offense of aggravated battery in that he, without justification, intentionally caused great bodily harm to William D. Benton in violation of section 12—4(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(a)), while in count II he was indicted for the same offense under section 12—4(b)(1) in that he was there charged with using a deadly weapon in the commission of a battery. Defendant's indictment also contained one count charging unlawful use of weapons (Ill. Rev. Stat. 1981, ch. 38, par. 24—1(a)(2)). Defendant was convicted on all counts by a jury in the circuit court of Williamson County. On appeal, defendant contends: (1) that the State failed to prove beyond a reasonable doubt that defendant's use of deadly force was not justified; and (2) that both aggravated battery convictions cannot stand pursuant to our supreme court's opinion in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273. We affirm.

On the evening of February 5, 1983, and early morning hours of February 6, 1983, Mark Benton hosted a party in his apartment. The guests included individuals who live in the same apartment building as Benton. The record indicates that the guests indulged in drinking alcoholic beverages and that numerous fights broke out among the guests. Defendant and the decedent, William D. "Bugsy" Benton, Mark's cousin, were involved in two fights. Mark Benton testified that the first fight was a knife fight and that after it, decedent and Victor Murphy went to decedent's room and closed the door. According to Mark Benton, defendant first went to his room then down the hall to decedent's room where defendant enticed, in vulgar language, decedent to come out and fight, whereupon decedent came out of decedent's room with the end of a three-piece pool cue in his hand and hit defendant on the shoulder with the cue. Mark Benton stated that he lost sight of decedent and defendant when they commenced wrestling and struggled into decedent's room. Defendant, who weighed more than decedent, was on top of decedent. Mark Benton testified that he did not see decedent strike defendant after the combatants were on the floor.

Victor Murphy testified as follows: After the first altercation between defendant and decedent, Murphy took decedent to his room and shut the door. During this first altercation, defendant "pounded" on decedent without decedent being able to reciprocate in kind. Shortly thereafter defendant came down the hall and threatened decedent; and decedent grabbed part of a pool cue, opened the door, and attempted to hit defendant. Defendant jabbed at decedent with a knife. When defendant got on top of decedent, defendant put a knife in decedent's face and stated: "Do you want to die?" Murphy pulled defendant away from decedent.

Defendant testified as follows: Everyone at the party had been arguing and decedent had been fighting with various people. When Murphy and decedent departed from the main group of the party, the group became quiet. Randy Fofar, who recently joined the party, was accompanied by decedent and Murphy, all of whom started to argue with defendant and Mark Benton. Decedent had a dumbbell with which he punched a hole in a hallway wall and threatened various party-goers. Defendant then returned to his room and heard a female voice say, "He's got a knife." Defendant picked up his knife, which was still in the sheath, stepped into the hall and saw decedent chasing Fofar with the knife. Fofar ran into Mark Benton's room, and defendant knocked decedent against a wall. Defendant stated to decedent: "If you want to fight with a knife, I've got one right here." Decedent ran into Murphy's room and threw down a knife. Defendant then started to go back into an apartment but turned around when he heard footsteps and saw decedent, who hit defendant in the face with his fist. Defendant hit decedent, threw him to the floor, and then released him on the condition that decedent go to his room or leave the building. Defendant returned to Mark Benton's room where he stayed for approximately 30 minutes, when decedent started yelling insults to defendant and challenged defendant to a fight. Decedent and defendant starting arguing; however, both men soon started for their rooms. Decedent then ran toward defendant, screamed that he would kill defendant, and hit defendant across the shoulder with the heavy end of a two-piece pool cue. The arm became numb and defendant was unable to move it. Defendant tried to get away, but decedent kept hitting him and screaming that he would kill defendant. Defendant turned and started to fight back with his right hand. Decedent wound up on the floor with defendant on top of him. Decedent went limp and defendant noticed two stab wounds under decedent's left arm. Although defendant did not remember pulling his knife, defendant saw his knife in his right hand. Defendant then ran to the police

station and asked for an ambulance to be sent for decedent. Defendant's arm was placed in a sling at the hospital. Defendant admitted that although decedent was the taller of the two men, defendant weighed more than decedent and was not afraid of decedent.

Paul D. Hutson, defendant's brother, testified that he saw decedent charge with a pool cue from a room and strike defendant with the cue. Paul Hutson then went to get a club and observed no more of the altercation.

The parties stipulated that William Benton died of stab wounds received from defendant on the night or morning of February 6, 1983.

Janet Berra, who works for an ambulance service, testified when she went to pick up Benton, defendant stated: "I didn't mean to do it that bad, but he hit me first."

Defendant initially contends on appeal that the State failed to prove beyond a reasonable doubt that defendant was not justified in his use of force against William Benton. Defendant offered evidence tending to prove that he acted in self-defense; therefore, the State had the burden of proving the defendant's guilt beyond a reasonable doubt as to that issue together with all elements of that offense. *People v. Connelly* (1978), 57 Ill. App. 3d 955, 956-57, 373 N.E.2d 823, 825.

■ Criteria for determining whether a defendant's use of force is justified as self-defense have been enumerated as follows:

> "[T]hese are: (1) that force is threatened against a person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable." (*People v. Connelly* (1978), 57 Ill. App. 3d 955, 957, 373 N.E.2d 823, 825.)

Our attention in the case at bar is focused on element 5(c). The State contends that defendant did not reasonably believe that deadly force was necessary. Defendant contends that he had a reasonable belief that deadly force was necessary as the decedent charged at him and hit him with the heavy end of a pool cue.

■ In this regard, a criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. The relevant question is whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. In the instant case, the resolution of defendant's guilt or innocence depended on the credibility of the witnesses and the weight given their testimony, which are exclusively within the province of the jury. *People v. Collins* (1985), 106 Ill. 2d 237, 261-62.

■ In the case at bar, evidence was introduced that defendant was not afraid of decedent nor was anyone else at the party because decedent was continually being picked on by others. Since defendant could not remember at trial when the fatal blows were struck and Murphy's testimony is ambiguous, the jury could have found that the fatal blows occurred after the combatants started to wrestle on the floor and after defendant had used his superior strength in subduing decedent. Mark Benton did not observe defendant using his knife but did observe the combatants wrestling into the room. The knife used was described variously as being a blade 4½ to 10 inches in length; therefore, defendant knew that great bodily harm would result if he jabbed someone with it. Based on the foregoing evidence, this court cannot say that the jury's verdict was not supported by the evidence.

■ Defendant last urges that one of his aggravated battery convictions must be vacated under the rationale of *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273, because the aggravated battery convictions alleged arose out of the same physical act. This contention was addressed by the court in *People v. Post* (1982), 109 Ill. App. 3d 482, 440 N.E.2d 631, in which the defendant was charged with aggravated battery using a deadly weapon, aggravated battery causing great bodily harm, aggravated battery causing permanent disability, and aggravated battery causing permanent disfigurement. The charges arose out of an altercation in which defendant was shown to have stabbed the victim with a knife in the back once and three times in the thigh. In spite of the fact that the four offenses charged arose from a series of closely related acts in very rapid succession, the court in *Post* observed that the victim suffered four distinct stabbings and that the four offenses charged were not, by definition, lesser included offenses. Therefore, the court determined that a conviction on each offense with concurrent sentences was proper. *Cf. People v. Dixon* (1982), 91

Ill. 2d 346, 438 N.E.2d 180.

In the case at bar, William Benton received two stab wounds; and, although they were closely related in time and to the same area of the body, they were not caused by the same physical act. Defendant was charged with two separate offenses of aggravated battery arising out of the two stab wounds that he inflicted on the victim, one being aggravated battery causing great bodily harm and the other being aggravated battery using a deadly weapon. Therefore, under the rationale of *People v. Post* (1982), 109 Ill. App. 3d 482, 440 N.E.2d 631, separate convictions and sentences for each offense was proper.

For the foregoing reasons, all of defendant's convictions and sentences are affirmed.

Affirmed.

KARNS and WELCH, JJ., concur.