THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL AVANT, Defendant-Appellant.
Fourth District   No. 4—88—0216

Opinion filed January 9, 1989.—Rehearing denied February 6, 1989.

140

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

After a jury trial, the defendant was convicted of the offense of robbery, a Class 2 felony (Ill. Rev. Stat. 1985, ch. 38, par. 18—1). Upon review of his criminal history, he was sentenced to a term of seven years' imprisonment (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(5)). Defendant appeals from the judgment of the circuit court of Champaign County, arguing (1) he was not proved guilty beyond a reasonable doubt where the case rested on circumstantial evidence, fingerprints; and, alternatively, (2) reversible error occurred when the instructions relating to the robbery charge did not expressly include one of the mental states contained in section 4—3(a) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1985, ch. 38, par. 4—3(a)). We affirm.

The robbery charge arose from an incident on Friday, April 3, 1987, at the office of Illinois Power Company, located near the access road to I-74 in Urbana, Illinois. Carrie Banks had been working all morning at one of two desks recessed beneath the office counter in the cashier area. At around 11 a.m., she began accepting customer payments as a relief cashier, while the cashier was on her lunch hour. At about 11:45 a.m., after completing a line of 8 to 10 customers, she turned in her swivel chair to straighten out her cash drawer. When Banks turned back, a slender black man was already at the counter, and a brown paper bag with a ragged hole in the bottom sat on the counter slightly to Banks' left. She asked, "May I help you?" and the man said, "Just put all the cash in the drawer—Put all the cash in the bag." The man handed her a small, brown paper bag which he held in his left hand. He had his right hand in his coat pocket and appeared to be pointing something at Banks. Banks put currency of different denominations in the bag three or four times, including 10's, 20's, 50's, and possibly 100's. At some point, the man said, "That's enough. That's enough," and he turned, took the bag, and left. Banks did not see him go out the door, but testified she knew when he left because she then stood up and said, "I've been robbed."

At that point, several other customer service representatives, Sally Glenn and Cassandra Jackson, came to or around the cashier area where Banks was. Several employees took Banks to a lounge area of the office, the police were called, Sue Doolen took over the cashier duties behind the counter, and another employee, Jeff Klinck, remained in front of the counter, preserving the scene and routing people.

When police arrived, officers interviewed Banks, who described the robber as 5 feet 8 inches or 5 feet 9 inches tall, in his early to mid-20's, clean shaven, with short and neat hair. Banks testified she could

not recall whether he was wearing gloves during the incident, but said he appeared nervous since he was shaking during the entire incident.

Russell Somers, an engineering employee of Illinois Power Company, was returning to the office at 11:45 or 11:50 a.m. when his pickup was cut off nearby by a blue AMC Pacer which had been parked with its four-way emergency flashers on. Somers saw some feet under the car, which disappeared into the passenger side as the car pulled away—in one constant motion from where it was parked, running through a stop sign and traveling eastbound and to the entrance ramp to I-74. On I-74, the car proceeded westbound, and still had its four-way flasher signals on as it went down the Interstate. Somers proceeded to the Illinois Power parking lot.

After interviewing several employees, including Banks and Somers, the police began canvassing the neighborhood. The officers did not process the crime scene for fingerprints since no one had observed the robber touch anything in the course of the robbery.

Police were later called back to the office after employees found a note and another paper bag on Banks' desk. The note was processed for fingerprints, which were thereafter matched to those of the defendant.

According to the evidence adduced at trial, when Banks stood up and said she had been robbed, Jeffrey Klinck, an assistant supervisor, came to the cashier's cage while another assistant supervisor, Mark Peters, helped move Banks out of the area. Klinck remained in front of the cashier area for 10 to 15 minutes, until police arrived, and thereafter was relieved by Peters. Klinck testified that during that period no one placed any papers on Banks' desk or the counter, nor was anyone allowed near that part of the counter. Klinck had Sue Doolen begin working as the cashier. Klinck testified he observed four people in the cashier's area, Banks, Jackson, Peters, and Doolen.

Doolen testified she took over at Banks' desk three to five minutes after the robbery and observed a folded paper on Banks' desk, to the right of center, as she sat down. A supervisor took Banks' cash drawer to count it. Doolen was given another cash drawer to take on the cashier responsibilities. She said the folded paper must have been on the desk when she took over because no one else was there until she observed Peters remove the paper from the desk.

Within about two hours of the robbery, Peters noted a folded piece of notebook paper and a folded brown paper bag on the front of Banks' desk. Peters asked Doolen if she knew what the folded blue-lined paper was, and she did not. Using a pencil, Peters moved the folded paper onto a notebook, which he took to Mr. Pontifex' office. Pontifex

opened the note using two pencils. Inside, the words "place everything in the bag and we mean business," cut from newspapers or magazines, were taped to the blue-lined paper. The police were called back to the scene and took the folded note.

Banks' desk was lower than the counter and recessed beneath it. Banks testified she did not see the note or the folded brown paper bag on her desk before the robbery and they were not used by the robber during the course of the robbery. Doolen testified the items were not placed on Banks' desk after the robbery while she was working at the counter.

The note was sent to the Federal Bureau of Investigation in Washington D.C. in April 1987. In June 1987, Robert Fudella there processed the note, People's exhibit No. 3, for latent prints of value. He found three such prints on the outside of the note, not processing fragmentary prints consisting of double impressions, triple impressions, smudged prints, or those showing just a few ridges but without points of identity. Photographs were taken of the three latent prints and Fudella compared them to the fingerprint and palm print cards of two suspects forwarded by the Urbana police department. Later in September, Fudella compared the latent fingerprints with the ink prints of a third suspect, the defendant, People's exhibit No. 5, and found the three latent fingerprints matched the rolled prints of the defendant, one of his left thumb and two of his right index finger.

At trial, Officer Rodriguez identified People's exhibit No. 5 as showing inked fingerprints taken from a man named Michael Avant. Rodriguez testified she did not specifically remember defendant as the person from whom these fingerprints were taken. The State then presented the testimony of Officer Sloan, who identified People's exhibit No. 6 as the fingerprint card showing prints he took from the defendant.

Fudella testified fingerprints shown in People's exhibit No. 6 matched those shown on People's exhibit No. 5, which he had previously matched with the fingerprints found on People's exhibit No. 3, the note. Fudella testified the thumbprint was of the top tip of the thumb at the fold of the paper—the thumbprint ended at the crease and did not carry over beyond the fold. Fudella testified in his opinion the paper had to be folded at the time the print was imposed. Some of the words inside the note were taped across the crease in the paper. Based on this fact, the State argued the words were taped to the paper before it was creased, rather than afterward.

Banks was unable to identify defendant in a lineup or in court. She testified she saw the robber's face only briefly and her concentration

was directed instead to the robber's right hand, pointing at her from his pocket. Defendant presented an alibi defense, with acquaintances from Chicago testifying he was with them from April 1, 1987, through April 7, 1987. Defendant did not take the stand.

I

The State's case against defendant was based on the fingerprint evidence, *i.e.*, circumstantial evidence. Fingerprints are, however, circumstantial evidence of the highest order. The standard of review in such cases was stated in *People v. Rhodes* (1981), 85 Ill. 2d 241, 249, 422 N.E.2d 605, 608:

> "Circumstantial evidence is generally sufficient to support a conviction if it is inconsistent with any reasonable hypothesis of innocence, but the trier of fact need not search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. (*People v. Hancock* (1978), 65 Ill. App. 3d 694, 698.) Fingerprint evidence is circumstantial evidence which attempts to connect the defendant to the offense alleged. (*People v. Malmenato* (1958), 14 Ill. 2d 52, 62; *People v. King* (1980), 88 Ill. App. 3d 548, 552.) In order to sustain a conviction solely on fingerprint evidence, fingerprints corresponding to the fingerprints of the defendant must have been found in the immediate vicinity of the crime under such circumstances as to establish beyond a reasonable doubt that the fingerprints were impressed at the time the crime was committed. *People v. Taylor* (1965), 32 Ill. 2d 165, 168; *People v. Malmenato* (1958), 14 Ill. 2d 52, 62; *People v. Reno* (1975), 32 Ill. App. 3d 754, 758."

Determining the credibility of witnesses and the weight to be given their testimony is a function reserved primarily for the trier of fact, in this case the jury, and a court of review will not substitute its judgment in that regard. (*People v. Locascio* (1985), 106 Ill. 2d 529, 537, 478 N.E.2d 1358, 1361.) To prove guilt beyond a reasonable doubt does not mean that the jury must disregard the inferences that flow naturally from the evidence before it. (*People v. Albanese* (1984), 104 Ill. 2d 504, 514, 473 N.E.2d 1246, 1249, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) Moreover, the trier of fact may disregard exculpatory accounts or other evidence that tends to support or be consistent with a defendant's innocence and rest its decision instead on the circumstantial evidence of guilt presented by the State. (*Locascio*, 106 Ill. 2d at 537, 478 N.E.2d at 1361.) The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267; *People v. Harris* (1987), 162 Ill. App. 3d 618, 622-23, 515 N.E.2d 1272, 1274.) We conclude the evidence adduced at trial was sufficient to meet this standard.

## II

■■■ Alternatively, defendant argues his conviction cannot be sustained, as a matter of State and Federal constitutional law, where the jury instructions were constitutionally deficient because they failed to expressly include a mental state as an element of the offense, *i.e.*, the trial court erred in failing to instruct the jury on the mental state required to commit the crime of robbery. The State argues defendant has waived this issue by failing to object or proffer alternative instructions at trial and by failing to include this issue in his post-trial motion. On the merits, the State maintains the instructions were adequate to apprise the jury of the elements of robbery, *i.e.*, the necessary mental state is implicit in the instructions.

Generally, a defendant waives any error contained in jury instructions if he does not object or proffer alternative instructions at trial and, ordinarily, issues not properly raised in a defendant's post-trial motion will not be considered on appeal. (*People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141; *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) However, if the interests of justice require, substantial defects in jury instructions in criminal cases may be considered, even though the defendant has failed to properly preserve the issue for review. (107 Ill. 2d R. 451(c); *Reddick*, 123 Ill. 2d at 198, 526 N.E.2d at 147.) This exception is invoked to correct grave errors or to correct errors in cases so closely balanced that fundamental fairness requires that the jury be properly instructed. *People v. Thurman* (1984), 104 Ill. 2d 326, 472 N.E.2d 414.

Fundamental fairness includes, among other things, seeing to it that certain basic instructions, essential to a fair determination of the case by the jury, are given. (*People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861.) Instructions on the *essential elements* of the offense are among these basic instructions, and the trial court has the responsibility for ensuring that they are given. (*People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331.) The failure to correctly inform the jury of the essential elements of the offense charged has been held to be error so grave and fundamental that the waiver rule should not apply. (See

*Ogunsola*, 87 Ill. 2d at 222, 429 N.E.2d at 864 (and cases cited therein).) For the reasons discussed herein, we conclude this is not such a case, so the issue may be deemed waived.

Section 4—3(a) of the Code provides that a person is not guilty of an offense, other than an offense which involves absolute liability (see Ill. Rev. Stat. 1987, ch. 38, par. 4—3(a)), unless the person acts while having one of the mental states described in sections 4—4 through 4—7 of the Code (Ill. Rev. Stat. 1985, ch. 38, pars. 4—4 through 4—7), intent, knowledge, recklessness, or negligence. The statute defining robbery does not prescribe a particular mental state:

> "A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force." (Ill. Rev. Stat. 1985, ch. 38, par. 18—1(a).)

By the terms of section 4—3(b) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 4—3(b)), therefore, any mental state defined in sections 4—4 (intent), 4—5 (knowledge), or 4—6 (recklessness) of the Code is applicable. The State need only prove general intent to satisfy the *mens rea* of robbery. See *People v. Anderson* (1981), 93 Ill. App. 3d 646, 653, 417 N.E.2d 663, 668-69 (and cases cited therein); *People v. Thompson* (1984), 125 Ill. App. 3d 665, 673, 466 N.E.2d 380, 386-87.

Defendant does not allege that general intent was not proved at trial. Rather, he maintains that as robbery is not a crime of absolute liability, section 4—3(a) of the Code, "incorporates a mental state requirement in the definition of each of these offenses." (*People v. Grant* (1981), 101 Ill. App. 3d 43, 47-48, 427 N.E.2d 810, 814.) On this basis defendant argues that, as a matter of Illinois law, a mental state is an essential element of the offense of robbery such that it must be expressly instructed on.

We disagree. Upon consideration of the authorities, we find such cases as *Grant* (assault and criminal trespass to land) and *Ogunsola* (deceptive practices) distinguishable. We find the analysis of the First District Appellate Court in *People v. Anderson* (1981), 93 Ill. App. 3d 646, 653-55, 417 N.E.2d 663, 668-70 (armed robbery, rape, deviate sexual assault), the Second District Appellate Court in *People v. Ortiz* (1987), 155 Ill. App. 3d 786, 791-93, 508 N.E.2d 490, 494-95, *appeal denied* (1987), 116 Ill. 2d 571 (aggravated criminal sexual assault), and *People v. Leonard* (1988), 171 Ill. App. 3d 380, 383-85, 526 N.E.2d 397, 399-400, *appeal denied* (1988), 123 Ill. 2d 563 (aggravated criminal sexual assault), and this District in *People v. Talley* (1988), 177 Ill. App. 3d 170 (armed robbery), and *People v. Terry* (1988), 177 Ill. App. 3d 185 (aggravated criminal sexual assault), persuasive.

On appeal in *Grant*, the defendants contended the jury instructions relating to assault and criminal trespass to land (Ill. Rev. Stat. 1979, ch. 38, pars. 12—1, 21—3(a)) were improper and prejudicial because they did not expressly include one of the mental states set forth in section 4—3(a) of the Code. Defendants had submitted instructions taken from Illinois Pattern Jury Instructions, Criminal, Nos. 11.01 and 11.02, the definition and issues instructions on assault, and Nos. 16.05 and 16.07, the definition and issues instructions on criminal trespass to land. (IPI Criminal Nos. 11.01, 11.02, at 163-64 (assault), Nos. 16.05, 16.07, at 252, 254 (criminal trespass) (1968).) The State maintained defendants had thereby waived any error in the instructions, as is the general rule. *Grant* stated the offenses were not absolute liability crimes. In addition, "[t]he statutes defining assault and criminal trespass to land do not expressly include a mental state." (*Grant*, 101 Ill. App. 3d at 47, 427 N.E.2d at 813.) The *Grant* court nevertheless found the instructions lacked an essential element of the crimes charged, the mental state, and reversed the convictions, remanding for a new trial. Subsequent to the decision in *Grant*, the pattern jury instructions for both assault and criminal trespass to land were revised to expressly provide specification of the mental state. Illinois Pattern Jury Instructions, Criminal 2d, Nos. 11.01, 11.02, at 75-76 (2d ed. Supp. 1987) (assault); Nos. 16.05, 16.07, at 339, 341 (2d ed. 1981) (criminal trespass to land) (IPI Criminal 2d).

In *People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861, the defendant was tried by jury in November 1979 and was convicted for deceptive practices. The jury instructions failed to include an allegation that the defendant had an intent to defraud. There, the statutory definition of deceptive practices, as originally enacted, did not refer to the intent to defraud. In *People v. Billingsley* (1966), 67 Ill. App. 2d 292, 213 N.E.2d 765, the court held that intent to defraud was a necessary element of deceptive practices, despite the lack of explicit reference to it in the statute. In 1967, the statute was amended to insert "with intent to defraud" in the introductory phrase. The first edition of the pattern jury instructions, published in 1968, omitted the element of intent. (*Ogunsola*, 87 Ill. 2d at 220, 429 N.E.2d at 863.) By further amendment in 1978, the General Assembly added a definition of the intent to defraud. As the court explained in *Ogunsola*, intent to defraud was clearly an essential element of the offense charged and this intent was a mental state distinct and different from the mental state of knowledge. (*Ogunsola*, 87 Ill. 2d at 221-22, 429 N.E.2d at 863-64.) The court found the principal contested issue relevant to defendant's culpability was whether he had intent to defraud. Accordingly, the su-

preme court found reversible error, concluding the omission removed from the jury's consideration a disputed issue essential to the determination of the defendant's guilt or innocence. The court declined to hold the issue waived and specifically distinguished its decision in *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 415 N.E.2d 1027, which held the jury was given all instructions essential to determining a defendant's guilt or innocence of theft, and the absence of an instruction on the element of the value of the property stolen, which was not disputed, did not affect that determination.

The jury instructions on deceptive practices were revised to expressly include the mental state element. IPI Criminal 2d No. 13.24, at 300.

In *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, the defendant was charged with murder, presented a claim of self-defense and, alternatively, claimed he was guilty only of voluntary manslaughter. The evidence regarding murder, self-defense, and voluntary manslaughter was conflicting. The instructions in *Reddick* erroneously stated the burden of proof regarding the mitigating circumstances of voluntary manslaughter, resulting in confusing and misleading instructions to the jury, a grave error requiring reversal despite the lack of an objection by defendant in the trial court.

*Ortiz* and *Leonard* held that in aggravated criminal sexual assault cases, sexual penetration is a general intent crime and a mental state of intent, knowledge, or recklessness would be implied to satisfy the intent requirement. (Accord *Anderson*, 93 Ill. App. 3d at 653-55, 417 N.E.2d at 668-70 (as to armed robbery, rape, and deviate sexual assault).) The Second District Appellate Court further noted the approved jury instructions relating to sex offenses demonstrate that instructions defining general intent offenses need not expressly set forth a specific mental state. (*Ortiz*, 155 Ill. App. 3d at 792, 508 N.E.2d at 494; *Leonard*, 171 Ill. App. 3d at 385, 526 N.E.2d at 400.) This court agreed. See *People v. Terry* (1988), 177 Ill. App. 3d 185, 193.

In *Leonard*, the second district also distinguished the supreme court's decision in *People v. Valley Steel Products Co.* (1978), 71 Ill. 2d 408, 375 N.E.2d 1297, cited by defendant, stating:

> "Examination of the cases cited in *Valley Steel Products* indicates that only where the statutory definition of an offense includes a mental state with which the act is committed as an element of the offense, that mental state must be alleged in the charging instruction to meet the requirements of section 111—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 111—3)." *Leonard*, 171 Ill. App. 3d at 384, 526

N.E.2d at 400.

Here, the People's instructions Nos. 9 and 10, the approved robbery definition and the issue instructions, IPI Criminal 2d Nos. 14.03 and 14.04, at 309-10, were given without objection by defendant. The definition instruction, IPI Criminal 2d No. 14.03, stated: "A person commits the offense of robbery when he takes property from the person or the presence of another by the use of force or by threatening the imminent use of force." The issues instruction, based on IPI Criminal 2d No. 14.04, provided:

"To sustain the charge of robbery, the State must prove the following propositions:

*First:* That the defendant took United States currency from the person of Carrie L. Banks; and

*Second:* That the defendant did so by the use of force or by threatening the imminent use of force.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (IPI Criminal 2d No. 14.04, at 310.)

The jury was thus instructed in the elements of the offense as it is defined by statute. Repeatedly this type of instruction has been held sufficient to inform the jury of the essential elements. (See *Anderson*, 93 Ill. App. 3d at 654-55, 417 N.E.2d at 669 (and cases cited therein).) We conclude these instructions were properly given and correctly state the Illinois law as to the essential elements of the offense of robbery.

■ Defendant also argues, as a matter of Federal law, due process protects an accused against conviction except upon proof beyond a reasonable doubt as to every essential element of the crime charged and the mental state may not be "implied or presumed." In support of his argument, defendant cites *Sandstrom v. Montana* (1979), 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450, *Francis v. Franklin* (1985), 471 U.S. 307, 85 L. Ed. 2d 344, 105 S. Ct. 1965, and *Yates v. Aiken* (1988), 484 U.S. 211, 98 L. Ed. 2d 546, 108 S. Ct. 534. These cases considered the propriety of jury instructions on evidentiary presumptions, as to which the appropriate mode of constitutional analysis was stated in *In re Winship* (1970), 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1073, wherein the Court stated:

"Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the

Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of *every fact* necessary to constitute the crime with which he is charged." (Emphasis added.)

In *Sandstrom*, the Court found the question presented was:

"[W]hether, in a case in which intent is an [essential] element of the crime charged, the jury instruction, 'the law presumes that a person intends the ordinary consequences of his voluntary acts,' violates the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt." (*Sandstrom*, 442 U.S. at 512, 61 L. Ed. 2d at 43, 99 S. Ct. at 2453.)

The Court found it did, reasoning:

"The petitioner here was charged with and convicted of deliberate homicide, committed purposely or knowingly, under Mont. Code Ann. §45—5—102(a) (1978). *** It is clear that under Montana law, whether the crime was committed purposely or knowingly is a fact necessary to constitute the crime of deliberate homicide. Indeed, it was the lone element of the offense at issue in Sandstrom's trial, as he confessed to causing the death of the victim, told the jury that knowledge and purpose were the only questions he was controverting, and introduced evidence solely on those points. *** Moreover, it is conceded that proof of defendant's 'intent' would be sufficient to establish this element. Thus, the question before this Court is whether the challenged jury instruction had the effect of relieving the State of the burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind. We conclude that under either of the two possible interpretations of the instruction set out above, precisely that effect would result, and that the instruction therefore represents constitutional error." (*Sandstrom*, 442 U.S. at 520-21, 61 L. Ed. 2d at 49, 99 S. Ct. at 2457-58.)

*Sandstrom* involved a specific intent crime and the particular mental state with which the defendant acted was tied to the degree of culpability, the defendant admitting the killing, but arguing he did not do so "purposely or knowingly," and was therefore not guilty of "deliberate homicide" but of a lesser crime.

In *Franklin*, the defendant was charged with malice murder and kidnapping. His sole defense to the malice murder charge was a lack of the requisite intent to kill. Franklin, a prisoner, escaped from custody and fled with the hostage, coming upon the home of the victim. Franklin pounded on the heavy front door and the victim answered. Franklin

was pointing a stolen pistol at the door when the victim arrived and, as Franklin demanded his car keys, the victim slammed the door. At that moment, Franklin's gun went off. The bullet traveled through the wooden door and into the victim's chest, killing him. On the dispositive issue of intent, the trial judge instructed the jury to presume an essential element of the offense—intent to kill—upon proof of other elements of the offense—the act of slaying another—but explicitly informed the jury that the presumption "may be rebutted." The Court found this distinction did not suffice to cure the infirmity in the instructions. Again, *Franklin* involved a specific intent offense where the principal contested issue relevant to defendant's culpability was whether he had the intent to kill.

In *Aiken*, the petitioner and an accomplice robbed a country store in South Carolina. After the petitioner left the store, a fight occurred in which the accomplice and the storekeeper's mother were both killed. At his trial, petitioner testified the decedent had not even entered the store before he left and that he had not intended to kill or harm anyone. The jury, however, was instructed "that malice is implied or presumed from the use of a deadly weapon." The Supreme Court reversed and remanded the cause, reaffirming the rule of *Sandstrom*, prohibiting the State from making use of jury instructions that have the effect of relieving the State of the burden of proof on the critical question of intent in a criminal prosecution.

These Federal cases involved circumstances closer to those in *Ogunsola*, where the defendant's mental state was critical to his culpability and was essential to the jury's deliberations as to his guilt or innocence—cases where the accused's mental state was contested, which it was not in the case before us. This case does not involve an instruction on evidentiary presumptions and these cases are inapposite to the issue before us.

Accordingly, we affirm the judgment of the circuit court of Champaign County.

Affirmed.

LUND and GREEN, JJ., concur.