THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SCOTT MABERRY, Defendant-Appellant.

Fourth District No. 4—88—0652

Opinion filed January 18, 1990.

Daniel D. Yuhas and Lawrence J. Essig, both of State Appellate Defender's Office, of Springfield, for appellant.

Charles Colburn, State's Attorney, of Jacksonville (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

Following a jury trial, defendant Scott Maberry was found guilty of aggravated criminal sexual assault and home invasion and sentenced to concurrent 12-year prison terms for each offense with three years' supervisory release. Defendant raises five issues on appeal: (1) whether the trial court erred in admitting statements of identification of the defendant by the victim and the police as corroborative complaints and thereby denied defendant a fair trial; (2) whether the prosecutor's repeated misstatements of the evidence during closing argument denied defendant a fair trial; (3) whether various evidentiary rulings denied defendant the right to present a defense and, thus, violated the compulsory process clause of the sixth amendment; (4) whether defendant's conviction for home invasion must be vacated because defendant's knife was not a "dangerous weapon" as defined by section 33A—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 33A—1); and (5) whether the jury instructions for aggravated criminal sexual assault were deficient because no mental state was included in the instructions. We affirm.

On February 9, 1987, the defendant was charged by indictment with two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(1)) and one count of home invasion (Ill.

Rev. Stat. 1987, ch. 38, par. 12—11). The defendant pleaded not guilty, and a jury trial commenced on June 15, 1988.

## I. REVIEW OF EVIDENCE

### A. STATE'S CASE

The victim testified that on July 31, 1986, she stayed overnight at the home of a friend in Jacksonville, Illinois. At approximately 11:30 p.m. on July 31, the friend noticed the victim's ex-boyfriend, Bob Leonard, driving past the home on more than one occasion. The friend told the victim and both decided to call the South Jacksonville police department and request extra patrols because the victim was afraid of Leonard. Although Leonard was never actually observed near the home that night by the victim and he was not seen again by the friend, the victim testified she and her friend decided not to sleep alone that evening "in case Bob decides that he is going to come back and do something." They then moved their belongings from the bedrooms into the living room and prepared to sleep on the living room floor.

According to the victim, at approximately 12:30 a.m. on August 1, 1986, she and her friend were still awake when the defendant knocked at the front door. The victim had gone to school with the defendant for three to four years and worked with him at a local retail store. All three sat and talked for approximately 30 minutes in the house. The defendant left the residence at about 1:08 a.m. after being asked to leave several times. After defendant left, the victim recalled telling her friend that it was awful funny "that defendant lied to them" and "that he was even there in the first place."

### (1) ASSAULT AND INITIAL STATEMENTS IDENTIFYING DEFENDANT AS ASSAILANT

#### (a) VICTIM

According to the victim, at approximately 4:45 a.m., she was awakened by a naked man wearing a white mask. He woke her up by poking her in the right breast with a knife. The mask was circular with diamond-shaped holes for each eye, and covered the face of the perpetrator completely. She stated the knife was about five to six inches long with a shiny silver blade; the tip looked as if it had been broken off. She described the perpetrator as having brown hair, standing five feet five inches tall, with "kind of a husky build"; that she stood five feet two inches in height, and the perpetrator was "a

little taller than I am." The victim stated she grabbed the perpetrator's arms and asked who he was and what he wanted. The perpetrator told her to be quiet and directed her into the bedroom with the knife, then ordered her to take off her clothes. After removing her clothes, the perpetrator engaged in vaginal and oral sex with the victim. The attack lasted about five minutes, during which time the perpetrator held the knife or had it nearby on the bed. The perpetrator then unsuccessfully attempted to use a towel to gag the victim. He then ordered her to leave the bedroom through the hallway and to walk into the kitchen. She stated the perpetrator picked up some keys or coins that were on an ironing board in the kitchen and led her out onto the back porch, where he stopped briefly, apparently looking for something on top of the refrigerator. There was nothing on the ironing board when she went to bed. The perpetrator had brown straight hair that was "choppy looking, like it was uneven."

The victim and the perpetrator went outside, where he ordered her to lie facedown in the grass. He then threw the knife in the ground next to her leg. As she lay facedown in the grass, the perpetrator began putting on some clothes he retrieved as they exited the house. Her assailant withdrew the knife from the ground, ordered her to get into the car parked in the front driveway, and to wait 15 minutes until he was gone. She watched the perpetrator leaving the yard until she could not see him anymore, went back inside the house, locked the back door, and woke up her friend "after a few minutes of beating on her." She identified the clothes the perpetrator wore as: "blue jeans, tennis shoes, and a shirt that kind of had three-quarter sleeves that had stripes on the sleeve, was darker on the top and light in the stomach area."

She testified she had only a sheet wrapped around her when she tried to wake up her friend. She called her boyfriend, while she was trying to wake her friend, because she did not know what to do. While the victim was talking to her boyfriend about the attack, there was a knock at the front door. The boyfriend told the victim he would call the police. The police arrived at the residence within three minutes of the victim's telephone call with her boyfriend.

South Jacksonville police officers Mark Aydelott and Theresa Daniels responded to the call. The victim told Officer Daniels that she had been attacked and she was 99.9% certain it was the defendant who attacked her. She was certain the defendant was her attacker because of his voice, hair, and build; she became 100% certain about one month after the attack when she saw the defendant walking at school. She identified the defendant by his gait which, the vic-

tim stated, was the same one she had seen at the time of the attack.

### (b) FRIEND'S TESTIMONY

The friend testified the victim was staying at her house the evening of July 31 to August 1 because she, the friend, did not want to be alone in the house. She and the victim talked for a while before preparing to go to sleep. The victim ironed a shirt on the ironing board in the kitchen while they were talking.

She saw Bob Leonard drive by the house on July 31, 1986, and she and the victim decided to call the police. The defendant was a friend of the victim and, when he arrived at the house at 12:30 a.m. on August 1, she let him in the house to talk for a while. The defendant had two quarts of beer with him when he arrived. She further testified that after the defendant left the house early on the morning of August 1, 1986, she checked the doors and windows to be certain they were locked. She recalled telling the victim how she thought it was strange the defendant came to her house that night because he had never been there before and she did not think the defendant knew where she lived. She also stated there was nothing on the ironing board when she checked the doors.

The friend testified she was awakened at about 5 a.m. on August 1 by the victim standing above her, kicking her, and screaming that she had been raped. She stated the victim had a blanket wrapped around her and was very hysterical; the victim told her she was 99.9% sure the defendant was her attacker because of his build, the way his hair was cut, his height, and the way he talked in a low, rough whisper. The victim said her attacker was five feet five inches or five feet six inches in height.

She testified the defendant was probably close to five feet six inches tall. In describing Bob Leonard, she stated Leonard had dark brown hair and a mustache, was about six feet tall, slender, and weighed 160 to 170 pounds.

### (c) OFFICER DANIELS

Officer Theresa Daniels testified she went to the friend's residence at 4:53 a.m. on August 1, 1986, and met the victim, who was very hysterical. After the victim calmed down enough to speak, Officer Daniels testified the victim told her she had been raped by the defendant.

### (2) POLICE ACTIVITY AT THE SCENE AND EVIDENCE DISCOVERED

Officer Aydelott testified he arrived at the scene at approxi-

mately 5:15 a.m. He observed the screen above the sink in the kitchen was ripped and discovered a basement window broken and ajar. Subsequently, he and additional officers found the defendant asleep in a car parked in the driveway of the home. When discovered, the defendant's clothing was disorderly; the inseam of the pants was off to one side; his shirt was not tucked in; and his hair was disarranged. The defendant was taken to the Jacksonville police department, where Officer Aydelott took custody of the defendant's tennis shoes, Wrangler blue jeans, and gray and black shirt with red stripes. The clothing was soiled and wet with perspiration. The defendant did not have any underwear or socks on at the police station. Fifteen or twenty minutes had elapsed between the time Officer Aydelott arrived at the residence and searched the house and the time the defendant was discovered in the car. No mask was found by the police. Defendant told police he had been visiting the house earlier in the evening, but denied any involvement in the attack. After giving a statement to the police, the defendant was released without charge. Defendant was later arrested on February 9, 1987.

According to Officer Aydelott, during a pat-down search of the defendant at the scene, they discovered a penknife and a box cutter in the pocket of defendant's pants. The penknife had a two-inch blade. The owner of the house testified that prior to August 1, 1986, she had a utility knife or box opener on the ledge of the window above the kitchen sink. This window was the same window which had the screen torn on August 1. The utility knife was discovered missing in September 1986. The owner identified the utility knife taken from the defendant at the time of his arrest as the type of utility knife missing from her kitchen.

Larry Hood, a crime scene technician with the Illinois State Police, testified the basement window of the residence had been broken from the outside. The dust on top of the deep freeze beneath this window was disturbed and two unsmoked Marlboro cigarettes were on the floor near the deep freeze. The friend testified the defendant was smoking Marlboro cigarettes when he visited the house at 12:30 a.m. on the night of the attack.

Hood further testified the screen on the back door had been cut in the area by the door handle. A pair of white jockey shorts, size 34-36, was found behind a refrigerator located immediately to the right of the back door. A pair of men's socks was found on the ironing board in the kitchen.

Hood testified the pocket knife taken from the defendant had two blades. The end of the larger blade had been sharpened and had

been "peened," or hit with a ball peen hammer, to enlarge the blade so that it would fit tighter in the pocket. The tip of the knife was different from the rest of the blade. David Metzger, a forensic scientist with the Illinois State Police, later testified that the tip of the defendant's knife appeared to be damaged.

### (3) FORENSIC EVIDENCE

A forensic examination was done on the victim's underwear, the bed clothing in the bedroom, the socks found on the ironing board, and on the men's underwear found behind the refrigerator on the back porch. Examination of the pubic hair found in the men's underwear revealed it was Caucasian, but did not originate from the defendant or the victim. The head hair found in this underwear matched the defendant's hair in 16 out of 18 characteristics.

Phillip Sallee, the forensic serologist with the Illinois State Police who tested the hairs on the underwear, also tested four fibers on the socks and the bedclothes in the bedroom. Sallee found the same fiber, yellow cotton polyester thread, on the socks and on the sheet from the bedroom. Sallee also tested a head hair found on the socks and concluded it did not come from the defendant or the victim.

Blood-typing was conducted by Sallee on seminal material recovered from two cervical swabs used in the standard Vitullo Kit, and the seminal material on the panties recovered from the victim. According to Sallee, the seminal material from the swabs evidenced the following blood-type: ABO type A and H/PGM 2–1. The blood type of the defendant was determined as follows: ABO type A/PGM 1. The victim's blood type was determined to be ABO type O/PGM 2–1. Sallee explained that the PGM system is a separate blood-grouping system. The PGM is tested separately and under separate conditions. Sallee testified that the PGM is based upon enzymes found in all human beings. Sallee found the seminal stain on the panties to have type A and H activity present. Sallee was unable to get any PGM results from the victim's panties.

Sallee testified the defendant was a secretor whose blood type is present in his body fluids. The semen stains on the victim's panties and the seminal materials found on the vaginal swabs taken from the victim were consistent with the defendant's blood type and could have come from the defendant. Sallee also testified that approximately 32% of the male population in Jacksonville have the same blood type as the defendant. Sallee further testified that there was no question in his mind that the blood type in the semen stains was the same as the defendant's.

Sallee also tested several hairs recovered with the Vitullo Kit which were sealed in four envelopes and labeled: "Head hair combings, pulled head hair, pubic hair combings, pulled pubic hair." According to Sallee, there were two additional hairs found loose in the kit. Sallee determined that none of the hairs found in the kit could have come from the defendant.

## B. DEFENDANT'S CASE

### (1) OFFERS OF PROOF OUTSIDE THE JURY RE: ROBERT LEONARD

Police chief Richard Evans, of the Jacksonville police department, testified Leonard was arrested on August 1, 1986, on a burglary warrant. The warrant was issued after the police received a telephone call from the victim and her friend on July 31. At that time, the victim reported Leonard had stolen property from a local department store and was seen driving in the vicinity of the house where she was staying. According to Evans, the victim asked for extra police patrols after reporting the burglary. Some of the property allegedly stolen in the burglary was found in Leonard's car at the time of his arrest. A knife with a total length of 9½ inches was also found in the trunk of Leonard's car, along with Levi blue jeans and a cloth belt with gold buckle. This knife did not match the victim's description of the knife used by her assailant, since Leonard's knife was bigger and the end of the knife was not damaged.

Chief Evans testified that Leonard did not match the victim's description of the assailant since Leonard was 5 feet 9 inches or 5 feet 10 inches tall, weighed 140 pounds, and was very thin, the exact opposite of the assailant. Chief Evans testified Leonard was not a suspect in this case and that the police investigation could not place him anywhere near the scene of the rape. Chief Evans testified that he may have told Leonard's attorney, Ed Parkinson, that Leonard's clothing was being held for testing in this case. Evans stated it was police department policy not to release evidence without a court order and no court order had been issued regarding Leonard's clothing.

In his offer-of-proof testimony, attorney Ed Parkinson testified that he had represented Leonard from August 1986 to February 1987. Mr. Parkinson and Leonard's mother had made numerous requests to retrieve Leonard's personal items and clothing from the police. Mr. Parkinson stated he was told the clothing was being held for possible testing in this case. Parkinson testified that it was his understanding that two knives were found in Leonard's car and both may have been kept by the police. Parkinson stated that, according

to Leonard, he had two knives when he was arrested. Leonard did not tell his attorney how long the blades on these knives were.

## (2) ALIBI EVIDENCE

Officer Brad McElfresh testified regarding the alibi defendant gave to the police on August 2, 1986, regarding his activities on the evening of July 31 to August 1, 1986. McElfresh stated defendant said that at about 12:30 a.m. on August 1, after he left the friend's house, he went to another friend's house and, from there, walked to a nearby park known as Nicholas Park. Inside the park, the defendant saw a number of cars and people on the east side parked off the roadway. The defendant described one of the cars as a white, older model Cutlass that had two blue stripes and an "applied for" license sticker. The defendant said that he had talked with this group of people and then walked into a cornfield with one of the girls from this group and had sexual intercourse with her. According to the defendant, he was in the park sometime between 1 a.m. and 5 a.m. on August 1, 1986. After he left the park, defendant told police he walked back to the residence where the victim was staying, saw a light on inside and knocked at the door. After receiving no response, the defendant stated he climbed into the car in the driveway and fell asleep. Officer McElfresh testified his investigation found defendant's statement to be false. McElfresh testified that Nicholas Park closes at midnight and that the gates to the park are locked at that time.

In rebuttal, Officer Aydelott testified he closed Nicholas Park and locked all the gates at 11:58 p.m. on July 31, 1986. There was no one left in the park after he locked the gates. Officer Aydelott patrolled the park every 30 to 45 minutes on August 1. He did not see any cars or people on the east side of the park that night after it was closed. Officer Aydelott testified that cars cannot drive into the park after the gates are locked.

The State presented the testimony of several persons who were in Nicholas Park on the night of July 31, including the owner of the Cutlass described by the defendant. While all stated they did not know the defendant, they testified they were all together in a group in the park and did not recall any strangers walking up to their group. Several of these persons, including the owner of the Cutlass, also testified they left the park before it closed at midnight on July 31 because it is difficult to exit the park with a car after the park gates are locked.

### (3) OTHER DEFENSE EVIDENCE

The defendant introduced the testimony of Joye Sweetin to refute the victim's identification of the defendant. Sweetin testified she talked with the victim a few days after the attack and the victim told Sweetin she was raped in Springfield but did not know her attacker.

On cross-examination, Sweetin admitted she was a close friend of the defendant and did not talk to the police regarding her conversation with the victim. When called in rebuttal by the State, the victim stated she told Sweetin the defendant raped her.

### II. ANALYSIS

Initially, defendant argues the identification statements the victim gave to the police when they first arrived at the house were improperly admitted under the "prompt" or corroborative complaint exception to the hearsay rule. Defendant also contends these statements do not qualify as spontaneous declarations, which are admissible as exceptions to the hearsay rule. The defendant maintains the admission of these statements denied him a fair trial because the State repeatedly referred to these statements and actually misstated this evidence during closing argument.

As to the victim's statements to her friend and Officer Daniels on August 1, the State urges the defendant has waived this issue because no objection to the testimony of the victim, her friend, or Officer Daniels was raised at trial or in a post-trial motion. On the merits, the State agrees the statements of identification are not admissible under the corroborative complaint exception. However, the State maintains these statements are admissible as spontaneous declarations. Even if not so admissible, any error, according to the State, was harmless.

The record reveals the defendant did not object to the identification statements of the victim at issue on appeal. Failure to object at trial to a question calling for a hearsay response and failure to ask that the answer be stricken from the record results in waiver of the issue on review. (*People v. Stewart* (1984), 105 Ill. 2d 22, 56, 473 N.E.2d 840, 857.) Likewise, failure to raise the issue in a post-trial motion results in waiver of the issue on review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1129.) We find this issue is waived.

On the merits, complaints of rape victims are admissible as corroborative statements, but the statements are limited to the *fact* of the complaint. (*People v. Damen* (1963), 28 Ill. 2d 464, 473, 193 N.E.2d 25, 30-31.) The identity of the assailant is not admissible un-

der this exception. (*People v. Robinson* (1978), 73 Ill. 2d 192, 199-200, 383 N.E.2d 164, 168.) It is clear the statements regarding the identity of the defendant in this case were not admissible under this exception.

However, the statements qualify as excited utterances or spontaneous declarations and, thus, were admissible. The evidence established that the victim reentered the house after her assailant was out of view, tried to wake her friend, and called her boyfriend. The boyfriend testified the victim was hysterical on the phone. Her friend testified that before the police arrived and while the victim was hysterical, shaking, and crying, she said her attacker was the defendant and she was 99.9% sure. Officer Daniels testified the victim was hysterical when she arrived a few minutes later. In view of the victim's extreme emotional upset at the time the statements were given to her friend and Officer Daniels, the possibility of fabrication is nonexistent. *People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804.

With respect to defendant's assertion of the prosecutor's misstatement of evidence during closing argument, the record also demonstrates that no objection to the remarks was raised at trial nor was this issue raised in the post-trial motion. Therefore, the waiver doctrine is also applicable to these statements (*People v. Hall* (1986), 114 Ill. 2d 376, 418, 499 N.E.2d 1335, 1353), unless plain error was committed.

Plain error exists where a substantial right of the defendant to a fair trial is affected or the evidence in the case is closely balanced. *People v. Bradley* (1988), 172 Ill. App. 3d 545, 549, 526 N.E.2d 916, 919; *People v. Sexton* (1987), 162 Ill. App. 3d 607, 615, 515 N.E.2d 1359, 1365.

The misstatement of the evidence about which the defendant complains is that where the prosecutor stated: "She told *them* who it was and that's very important." (Emphasis added.) The defendant urges "them" refers to the doctor who examined the victim in the hospital and the boyfriend as well as the police officer and her friend. This is a misstatement of the evidence. The boyfriend and the examining physician were not told by the victim of the identity of her assailant, only that she was raped. However, later on during closing, the prosecutor referred to the fact that the victim told only her friend and Officer Daniels that she was 99.9% sure it was the defendant who raped her.

We conclude the prejudicial impact of this portion of one sentence during closing argument is negligible in this case. There were no repeated instances of misconduct in this case as in *People v. Whitlow*

(1982), 89 Ill. 2d 322, 433 N.E.2d 629. Nor is this a close case on the evidence or one involving remarks in closing which were severely prejudicial to the defendant as in *People v. Eddington* (1984), 129 Ill. App. 3d 745, 473 N.E.2d 103. Defendant relies on *Bradley* and *Sexton* in support of his plain error argument. Both cases are also sufficiently distinct from this case as to not be persuasive authority.

We conclude no plain error was committed in this case. Thus, we find any error during closing argument was waived. The evidence establishing defendant's guilt is not closely balanced, but is overwhelming. The victim testified she was 99.9% sure her assailant was the defendant based on his voice, hair, build, and gait. The victim had known the defendant for four years prior to the incident, having sat next to him in school and worked with him in a local retail store. The identification was corroborated by clothing found in the house, the forensic tests on the clothes, the knife found in defendant's possession and defendant's alibi later proved to be false.

Defendant next urges he was denied the right to present criminal defense evidence to the jury in violation of the compulsory process clause of the sixth amendment. (U.S. Const., amend. VI.) Defendant specifically refers to the evidence presented in two offers of proof regarding the clothing and weapons taken from Leonard when he was arrested on August 1, 1986, on an unrelated warrant. Leonard's clothing was similar in some respects to the clothing the victim described her assailant as wearing. The knife taken from Leonard was 9½ inches in total length and "shiny silver." The offers of proof were denied.

Initially, the State urges the defendant did not raise this precise issue at trial or in his post-trial motion and, thus, the issue was waived. On the merits, the State urges the trial court properly exercised its discretion in excluding the evidence as too speculative and remote.

■ The record reflects defendant strenuously argued for the admission of his offers of proof on Leonard. However, the compulsory process clause was not raised at trial or in a post-trial motion. It is generally held that constitutional issues raised for the first time on appeal are waived unless they pertain to the jurisdiction of the court. *People v. Amerman* (1971), 50 Ill. 2d 196, 279 N.E.2d 353; *People v. McGeorge* (1987), 156 Ill. App. 3d 860, 510 N.E.2d 1032.

■ The compulsory process clause of the sixth amendment of the United States Constitution affords a criminal defendant "the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evi-

dence that might influence the determination of guilt." (*Taylor v. Illinois* (1988), 484 U.S. 400, 408, 98 L. Ed. 2d 798, 810, 108 S. Ct. 646, 652, quoting *Pennsylvania v. Ritchie* (1987), 480 U.S. 39, 56, 94 L. Ed. 2d 40, 56, 107 S. Ct. 989, 1001.) This right is not unlimited and a defendant must comply with established rules of evidence and procedure designed to ensure both fairness and reliability in ascertaining guilt or innocence. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 302, 35 L. Ed. 2d 297, 313-14, 93 S. Ct. 1038, 1049.) A defendant does not have the right to offer incompetent or irrelevant evidence. *Taylor*, 484 U.S. at 411, 98 L. Ed. 2d at 811-12, 108 S. Ct. at 653.

■ The evidence excluded in this case was offered to establish that Robert Leonard, someone other than defendant, may have committed the crime. Such evidence is relevant and admissible only if and when a close connection can be demonstrated between the third person and the commission of the offense. (*People v. King* (1978), 61 Ill. App. 3d 49, 52, 377 N.E.2d 856, 859.) The admission of evidence that someone other than the accused may have committed the offense is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion. *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696, 702.

We find no abuse of discretion. We disagree with defendant's contention that the Leonard evidence was relevant. Defendant points to the fact that Leonard was seen in the area on the evening on July 31; that he had clothes similar to those described by the victim; that he resembled the physical description given by the victim; and he may have had a motive to harm the victim (because she turned him in to the police for burglary). This evidence fails to establish any link between Leonard and the attack which occurred in the early morning on August 1. (*People v. Smith* (1984), 122 Ill. App. 3d 609, 461 N.E.2d 534; *People v. King* (1978), 61 Ill. App. 3d 49, 377 N.E.2d 856.) Moreover, the victim stated Leonard was not her attacker; she never thought he was; the police stated Leonard was never a suspect in this case; and they could not place Leonard at the scene at the time of the attack. (*People v. Thomas* (1986), 145 Ill. App. 3d 1, 495 N.E.2d 639.) Further, Leonard's physical description differs from the detailed description given by the victim of her attacker whom she described in terms of his voice, gait and husky build.

Defendant next contends his conviction of home invasion must be vacated because he was not armed with a "dangerous weapon" as defined in the armed-violence statute. (Ill. Rev. Stat. 1987, ch. 38,

par. 33A—1.) The State urges, initially, that defendant has waived this issue because it was not raised at trial. Alternatively, the State contends the length of the knife blade is irrelevant because case law and the statutes focus on the manner in which weapons are used to determine whether they fit the category of a "dangerous weapon."

Section 12—11(a) of the Criminal Code of 1961 (Code) defines "home invasion":

"(a) A person who is not a péace officer acting in the line of duty commits home invasion when without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present and

(1) While armed with a dangerous weapon uses force or threatens the imminent use of force upon any person or persons within such dwelling place whether or not injury occurs, or

(2) Intentionally causes any injury to any person or persons within such dwelling place." (Ill. Rev. Stat. 1987, ch. 38, par. 12—11(a).)

"Dangerous weapon" is defined in the armed-violence statute:

"(a) 'Armed with a dangerous weapon'. A person is considered armed with a dangerous weapon for purposes of this Article, when he carries on or about his person or is otherwise armed with a category I or category II weapon. (b) A category I weapon is a pistol, revolver, rifle, shotgun, spring gun, or any other firearm, sawed-off shotgun, a stun gun or taser as defined in paragraph (a) of Section 24—1 of this Code, knife with a blade of at least 3 inches in length, dagger, dirk, switchblade knife, stiletto, or any other deadly or dangerous weapon or instrument of like character." (Ill. Rev. Stat. 1987, ch. 38, par. 33A—1.)

Defendant points out the knife found on his person had a less than three-inch blade and, therefore, it is not a "dangerous weapon" as defined in section 33A—1(b) of the Code.

■ Defendant has waived this issue because it was not raised in the trial court. (*Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.) On the merits, defendant's argument has been rejected in numerous cases involving various offenses. (See *People v. Carter* (1951), 410 Ill. 462, 102 N.E.2d 312; *People v. Hall* (1983), 117 Ill. App. 3d 788, 453 N.E.2d 1327; *People v. Samier* (1985), 129 Ill. App. 3d 966, 473 N.E.2d 601.) The reasoning of these cases is applicable here. The victim testified the defendant ordered her into the bedroom while hold-

ing a knife, ordered her to remove her clothes at knifepoint and held the knife on her while ordering her to move outside after the attack. The defendant clearly had the knife while in the house and held it in a threatening manner on the victim.

Defendant next contends the jury was not properly instructed on aggravated criminal sexual assault because no mental state was included in the instructions. The State argues the defendant has waived this issue for failure to tender any alternative instructions or object to the instructions at trial or in a post-trial motion. On the merits, the State maintains aggravated criminal sexual assault is a general intent crime, not requiring jury instructions on a mental state and this precise argument has been previously rejected by the courts.

The record reflects that the defendant did not object to the instructions given to the jury. Any error contained in jury instructions is waived if not objected to at trial or where no alternate instructions were offered. (*People v. Avant* (1989), 178 Ill. App. 3d 139, 145, 532 N.E.2d 1141, 1145; *Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.) We find defendant waived this issue.

On the merits, aggravated criminal sexual assault is a general intent crime, for which a mental state of intent, knowledge, or recklessness is implied to satisfy the general intent requirement. (*People v. Leonard* (1988), 171 Ill. App. 3d 380, 385, 526 N.E.2d 397, 399.) Defendant urges the failure to include the mental state in the instructions allows a presumption of a mental state to exist, which presumption runs afoul of the due process clause because it relieves the State of its burden to prove each element of an offense beyond a reasonable doubt. Defendant cites *Sandstrom v. Montana* (1979), 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450, *Francis v. Franklin* (1985), 471 U.S. 307, 85 L. Ed. 2d 344, 105 S. Ct. 1965, and *Yates v. Aiken* (1988), 484 U.S. 211, 98 L. Ed. 2d 546, 108 S. Ct. 534, in support.

Initially, we point out these cases are inapposite to the case before us. In all three cases, the particular mental state of the defendants was contested at trial and essential in the jury's deliberations as to the guilt or innocence of the defendants. Here, defendant argued at trial and now does similarly on appeal that he was not the perpetrator of the rape. Defendant has never asserted he lacked the requisite mental state for this offense, but nonetheless argues it must be included in the jury instructions. We find no merit in defendant's due process claim.

The elements of aggravated criminal sexual assault are a criminal

sexual assault committed when the accused displayed a dangerous weapon. (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(1).) A criminal sexual assault includes sexual penetration by use of force or threat of force. (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1).) The State must prove all the elements of aggravated criminal sexual assault beyond a reasonable doubt. (Ill. Rev. Stat. 1987, ch. 38, par. 3—1.) A mental state is implied in aggravated criminal sexual assault. Thus, jury instructions need not set forth a specific mental state. *Leonard*, 171 Ill. App. 3d at 385, 526 N.E.2d at 399.

For the foregoing reasons, the defendant's convictions and sentences are affirmed.

Affirmed.

KNECHT, P.J., and STEIGMANN, J., concur.