(No. 44040.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY WILLIAMS, Appellant.

*Opinion filed October 2, 1972.*

456

JAMES B. HADDAD, of Chicago, appointed by the court, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, ROBERT A. NOVELLE and HENRY A. HAUSER, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE WARD delivered the opinion of the court:

A jury in the circuit court of Cook County found the defendant, Anthony Williams, guilty of attempted aggravated kidnapping of a nine-year-old girl. He was sentenced to a term of 7 to 20 years in the penitentiary. The conviction was affirmed by the appellate court (131 Ill.App.2d 280), and we granted leave to appeal.

On February 26, 1968, Annette Ambrose left for school ahead of the normal time to perform some classroom chores for her teacher. Annette, who was nine years old at the time of her kidnapping, testified that at seven o'clock that morning she was walking north on Rockwell Street in Chicago when a man seized her by the waist from behind and began carrying her across the street towards a parked car. Before they had crossed the street, Annette testified, the man released her when a motorist pulled behind them and sounded his horn.

She identified the defendant in court as the man who had seized her and she also testified that she had picked the defendant from a pretrial lineup which was held on March 1, 1968. The lineup was composed of six or seven men, and she made her identification by walking with an officer towards the lineup and then tapping the defendant. She testified that no one had told her whom to identify, or had otherwise influenced her in this regard.

Annette testified that while being taken to the police station by Officer Richard Bedran of the Chicago police department, she was shown a likeness (which was a police sketch) of someone by the officer. She did not identify the picture as one of her attacker.

The witness said that although she did not see the man when he seized her and when he was carrying her across the street, she did turn around and observe him after he had released her. She testified also that she had seen the defendant driving past her on the street before the incident, but she had not seen him park or alight from his car.

Donald Schimek testified that at 7:00 A.M. on February 26, 1968, he was driving north on Rockwell

Street near 45th Street in Chicago when he observed a man with a girl in his arms crossing the street. The witness stopped his car because he became suspicious that something was irregular when he noticed that the girl appeared to be Caucasian and the man a light-skinned Negro. When he stopped, the man dropped the girl, who ran north to 45th Street and turned west. The man ran across the street, stopped momentarily, and then got in an auto which had been parked there with its door open. At this time Schimek mentally noted the license number of the car. Schimek followed the car for a very short distance but when he saw the girl, who had been taken up by a woman in her arms, he stopped his car. When told by the woman that someone had attempted to pull the girl into a car, he wrote down the license number he had noted on paper the woman gave him. He testified that the car he had seen was a late-model Oldsmobile and was dark in color.

Schimek identified the defendant in the courtroom as the man he had seen carrying Annette across the street, and he testified also that he had identified the defendant at a pretrial lineup of six or seven men held on March 1, 1968. In the room where the lineup was held were Annette Ambrose and two other children.

Schimek testified on cross-examination that when he first saw the defendant and the girl he was approximately one-half block away, and that when he stopped his car he was about one car length from them. He testified that the incident happened "pretty fast," but insisted that "the person did stop momentarily and I did look at his face." He said that when he first saw the man carrying the girl he was not certain that a kidnapping was taking place, and thought for a moment that it might be a father taking his daughter to school. When examined about the description he had given the police two or three hours after the incident, he said he recalled only that he had told the officer that the assailant "could have been a Negro, Mexican, Puerto Rican, light in color, curly hair, may have had a light, slight mustache."

In the week preceding the lineup, Schimek testified, he had been asked to assist a police artist in the preparation of a sketch of the man who had seized Annette. When he came to the police station to meet with the artist, there were two children, Catherine and Eldon Urbikas, who were assisting the artist in making a drawing. When the artist finished with the children, he brought a completed sketch to Schimek who testified that he was unable to say it was a good likeness of the man he had seen. He could not remember the differences he had suggested, except that he said he thought the "square" chin drawn by the artist was an inaccurate portrayal of the chin of the man he had seen carrying Annette.

Sergeant William Evans of the Robbins Police Department gave testimony that on March 1, 1968, at 2:00 A.M. he had arrested the defendant in front of a lounge at 137th and Clare Boulevard. He had found the defendant asleep behind the wheel of a 1968 Oldsmobile bearing license number 911 508, which was the number noted by Schimek at the scene of the crime. The witness told the court and jury that when he had awakened the defendant, the defendant first asked where he was and then told Evans that the car belonged to a friend in the lounge whom he was unable to name. The defendant, accompanied by the officer, was unable to locate the unidentified friend in the lounge.

The defendant did not take the stand to testify. The only evidence offered by the defense was the testimony of the officer who investigated the case, Richard Bedran. He testified that he interviewed Annette Ambrose a few hours after the attack upon her, and that she had given him a description of her assailant. The officer said that Annette had described the man as six feet tall, 180 pounds, very thin, and having short black hair. At the time Annette gave this description, the witness said she had told him that she was not certain that she could identify her attacker.

Officer Bedran also stated that he had interviewed Donald Schimek on the day of the incident, and that

Schimek had estimated the assailant's age to be between 28 and 30 years, his build as thin, and his hair as black, kinky and short.

Officer Bedran also told of having interviewed Catherine and Eldon Urbikas, two children who lived in the neighborhood where Annette had been seized. They had not witnessed the attack on Annette, but had been interviewed because earlier on the morning of Annette's experience they had seen and been frightened by a man near the location where Annette was carried off.

The officer was also questioned about the lineup in which the defendant had been identified by Annette and Donald Schimek. Annette, Schimek and the two Urbikas children were present, he testified, but only Annette and Schimek had made any identification.

The witness testified that just prior to the lineup he had shown Annette "a picture of a composite that had been drawn from the descriptions given by the other three witnesses," *i.e.,* the Urbikas children and Schimek. He was not questioned concerning this "composite." Bedran also said that the car in which the defendant was found belonged to a Mrs. Roland, who had reported it stolen on February 25, 1968, the day before the attempted kidnapping of Annette.

The first contention the defendant makes is that the indictment under which he was prosecuted was void. Citing the kidnapping statute (Ill.Rev.Stat. 1967, ch. 38, par. 10—1) and *People v. Marin, 48 Ill.2d 205,* he says that an element of the crime of kidnapping is that the confinement of a child under 13 years has been without the consent of its parents or guardian. The indictment did not allege this element and so, the argument is, the indictment is fatally defective. But the indictment was brought, not for kidnapping, but for the crime of attempt. As an indictment for conspiracy need not allege all the elements of the substantive offense which is the object of the conspiracy *(Stein v. United States (9th cir.), 313 F.2d*

*518*), in an indictment for attempt, the crime intended need not be set out as fully and specifically as would be required in an indictment for the actual commission of the crime. (*Baker v. State, 6 Md. App. 148, 154, 250 A.2d 677, 683; State v. Doran, 99 Me. 329, 332, 59 A. 440, 442;* 4 Wharton's Criminal Law and Procedure (1957), sec. 1793.) The Supreme Judicial Court of Maine in the *Doran* case said: "It is ordinarily sufficient to state the intended offense generally, as by alleging an intent to steal, or commit the crime of larceny, rape, or arson."

This is the only complaint of the defendant against the indictment and it is not tenable.

The next complaint of the defendant is that there was error in the admission of evidence that he was identified at the pretrial lineup held on March 1, 1968. The defendant founds this argument on the claim that under *United States v. Wade, 388 U.S. 218, 18 L.Ed.2d 1149, 87 S.Ct. 1926,* and *Gilbert v. California, 388 U.S. 263, 18 L.Ed.2d 1178, 87 S.Ct. 1951,* he was entitled to counsel at the conducting of the lineup. This claim, however, cannot be supported, for recently in *Kirby v. Illinois, 406 U.S. 682, 32 L.Ed.2d 411, 92 S.Ct. 1877,* the Supreme Court, when a similar argument was made, held that at a lineup after arrest but before the initiation of adversary judicial criminal proceedings an accused has not an absolute right to counsel. Here, as in *Kirby,* there had not been an initiation of judicial criminal proceedings at the time of the lineup, nor were there other circumstances possibly creating a right to counsel.

Alternatively, the defendant says the lineup identification was in conflict with the Supreme Court's decisions in *Stovall v. Denno, 388 U.S. 293, 18 L.Ed.2d 1199, 87 S.Ct. 1967,* and *Simmons v. United States, 390 U.S. 377, 19 L.Ed.2d 1247, 88 S.Ct. 967,* from which it is clear that, apart from any right to counsel, a pretrial confrontation might be "*** so unnecessarily suggestive and conducive to irreparable mistaken identification [as to deny the

accused] due process of law." (*Stovall v. Denno, 388 U.S. at 302.*) The court in *Foster v. California, 394 U.S. 440, 22 L.Ed.2d 402, 89 S.Ct. 1127,* held that identifications resulting from "unnecessarily suggestive" pretrial confrontations are inadmissible.

Here, before trial, the defendant made a motion to suppress the identification made of him by Annette Ambrose and Schimek on the ground that these identifications were "induced by the actions of the police." At a hearing on the motion the defendant made several attempts to question Annette and Schimek concerning their opportunities to observe the defendant at the time of the crime. The rationale of this line of questioning apparently was that if the witnesses did not have any or only a limited opportunity to observe him, the identification of the defendant must have been or probably was improperly suggestive. The trial court sustained the objections to the questioning when the prosecutor argued: "If counsel alleges there was any influence on the witnesses, let him bring out the influence first, Judge."

The defendant says it was error to forbid this questioning. The State's response is, as it was in the trial court, that before a witness may be questioned about his opportunities to observe the offender, the defendant must first make a showing that the police improperly and suggestively influenced the witness at the challenged pretrial confrontation, and that here the defendant failed to make that preliminary showing.

The argument of the State cannot be accepted. While an exhaustive catalogue of what may be relevant at a hearing on a motion to suppress identification evidence can hardly be announced, one may say with definiteness that an opportunity to observe or a lack of opportunity is certainly relevant when determining whether an identification by a witness was independent and free from suggestive influence. (*United States ex rel. Choice v. Brierly (3d cir.), 460 F.2d 68, 72.*) We do not judge, though, that the

failure to allow questioning at the hearing on the motion here was prejudicial to the defendant. At trial the question of opportunity was fully covered and we consider that the record demonstrates that the identifying witnesses had adequate opportunities to observe the defendant. We have described this in our earlier recital of the evidence.

The defendant, claims, too, there are other grounds showing police influencing of the identifications. He points first to the showing of the police sketch to Annette on the morning of the lineup, saying that the displaying of a photograph of an in-custody accused to a prospective witness before he views the suspect in a lineup is considered objectionable. (Wall, Eye-Witness Identification in Criminal Cases, p. 48.)

The argument must fail, however, for the record shows the sketch or likeness here could not have influenced the witnesses to identify the defendant. The witnesses testified the sketch was not a likeness of the man who molested Annette. Schimek said the drawing did not faithfully portray the defendant, and that the Urbikas children, who did not witness the attack on Annette, had contributed to the police artist's preparation of the sketch. Annette testified at the hearing on the motion to suppress and at trial that she did not identify the person in the drawing as her assailant.

Nor are we persuaded by the defendant's argument that improper suggestion resulted from having those who were to view the lineup in the room at one time, *i.e.,* Annette, Schimek and the two Urbikas children. This practice has been criticized, and correctly we consider, on the ground that there is a real risk that an identification made by one witness will influence identifications made by subsequent viewers of the suspect (Wall, Eye-Witness Identification in Criminal Cases, pp. 49 and 50). The testimony of the lineup witnesses, however, shows that the officers conducting the lineup were careful to keep each witness from knowing what identification might have been

made by a prior viewer of the lineup, and that until the showup was completed no witness knew what identification had been made by any other witness. This was done by having the viewers turn their backs to the lineup, with the exception of the viewer brought forward to the lineup to ascertain whether he could make an identification. Identifications of the defendant were made only by Annette and Schimek. The Urbikas children did not identify the defendant as the man they had seen.

It is appropriate to comment that while, on this record, we find no error from its use, the viewing procedure followed here is not without its dangers and should not be encouraged.

We do not find substance in the defendant's contention that it was error to have had a police officer escort the witness to within a few feet of the lineup so that the witness might make an identification by pointing to or touching the suspect. The testimony was that no witness had his attention directed to any particular man in the lineup, as might have been the case, for example, had the officer escorted the witness directly to the defendant.

The last argument of the defendant is that the evidence fails to establish his guilt beyond a reasonable doubt. In particular, he says that the identifications made by Annette and Schimek are lacking in credibility, because they saw Annette's abductor only briefly; that Schimek was at first uncertain that the person carrying Annette across the street was attempting to kidnap her; and that there was a substantial difference between the defendant's actual physical build and the description of his build given by the witnesses to the police after the incident.

We discussed identification evidence in *People v. Brengettsy, 25 Ill.2d 228, 231,* observing: "The sufficiency of the identification was a question of fact for the jury, (*People v. Keagle, 7 Ill.2d 408,*) and this court will not reverse unless the testimony is so unsatisfactory as to leave a reasonable doubt as to the guilt of the accused. (*People v. Ortega, 5 Ill.2d 79.*)"

We cannot say that the testimony here of identification leaves a reasonable doubt of the defendant's guilt. Both witnesses positively identified the defendant in a six- or seven-man lineup held only one week after the incident, and made positive identifications of him at trial. They had seen the defendant for only a short time, but each had the opportunity to observe and had a clear view of him. When Schimek stopped his car he was only one car length away from the defendant and although there was no direct testimony regarding the conditions of light, there was at least enough light to enable Schimek to observe the license number of the car used by the defendant. That Schimek testified he was at first uncertain whether he was witnessing an abduction related to his first impression of the incident, not to the accuracy of his physical observations. The extent of the discrepancy between the defendant's build and the initial description given by Annette and Schimek is not completely clear from the record. The court psychiatrist, who had examined the defendant, denoted on his report he was obese. But, in the defendant's motion for a new trial, the defendant was represented to be 5 feet 10 inches tall and 215 pounds, which all might not regard as "obese." The description ascribed to Annette was that the abductor was 6 feet tall, 180 pounds and very thin, and to Schimek that he was of thin build.

The sufficiency of the identification evidence was a question for the jury. It had before it this evidence of discrepancies and all the other evidence presented, including evidence of the positive identifications of the defendant at the lineup and at trial. This court does not, viewing all of the evidence, consider that a reasonable doubt of the defendant's guilt appears.

The judgment of the appellate court is affirmed.

*Judgment affirmed.*