THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GAMBINO YBARRA, Defendant-Appellant.

Second District   No. 2—85—0891

Opinion filed June 26, 1987.

G. Joseph Weller and Manuel S. Serritos, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (William L. Browers and Dale M. Wood, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Gambino Ybarra, appeals from his conviction for residential burglary by a jury in the circuit court of Kane County. (Ill. Rev. Stat. 1983, ch. 38, par. 19—3.) He was initially found unfit to

stand trial, and trial did not commence until he attained fitness, more than a year after the offense. He contends the State failed to prove beyond a reasonable doubt his intent to commit residential burglary.

Nicholas Sabadosh, the burglary victim, testified that he left his rented farmhouse residence on June 29, 1984, at approximately 7:45 a.m. The house is located in Elgin, Kane County, a few hundred feet from Route 72, between Gilberts and Dundee. He related that the doors of the house were locked, and that probably the upstairs windows and a kitchen window, protected by screens, were unlocked. A couple of the double-hung windows in the house were held closed by small nails. His two cats "had the run of the downstairs." He gave no one permission to enter the house in his absence.

When he returned at approximately 6 p.m., he noticed curtains fluttering through a rear window, which was one of the windows that had been held by two nails, and which he never opened. It was the window of a room in which he stored odds and ends. As he walked closer to the rear door, he saw two bags near the door which contained mostly paper refuse, paper cups and food containers. He saw no one in the room, so he entered the house and began a search of that room and the house. He testified the room contained "a disorganized clutter of various [of his] possessions; papers, stacks of magazines; a few boxes of various objects [in a state of disarray he] had been intending to reorganize for quite a while." The closet also contained various possessions of his which were likewise disorganized.

Thinking that the intruder might be in the basement, he opened the door, and the cats came out of the basement. He noticed dusty footprints on the mats at the top of the stairs coming out of the basement that were not his. When he left the house that morning, the basement door was closed, and it was closed when he returned home that evening. In relation to the storage room, the top of the basement stairs was about 30 feet away through the central room to the corner of the kitchen and out onto the enclosed porch. He did not notice any other footprints. Sabadosh identified the defendant in court as the man he saw in custody in the sheriff's police car at the house of his neighbor, Scott Kolbaba. Sabadosh stated that he did not know the defendant. Sabadosh also testified he did not have a crowbar inside his residence when he left home that morning.

On cross-examination, Sabadosh stated that as far as he could tell nothing had been disturbed, and neither the TV, radio, nor jewelry or anything of that nature had been moved, only the cats. None of the items in the bags found near the back door were his. The nails that had been holding the window closed were bent back and covered by

the portion of the window which had been slid up. He stated neither the window nor the glass had been damaged. On redirect, he stated there was no way the cats could have opened the basement door. Further, he stated that because of the disarray of the room, it would be very hard for him to ascertain whether anything had been moved. As far as he could see, nothing had been taken, and no item of value had been moved.

Scott Kolbaba, Sabadosh's neighbor, testified he returned from work at approximately 5:30 p.m. on the day in question. Kolbaba noticed a window curtain fluttering in the wind at Sabadosh's house. Kolbaba parked his motorcycle at his own house and proceeded to investigate. At Sabadosh's house, Kolbaba ducked his head in through the open window and observed a man standing in the closet inside the house. The man was "rummaging through some of the items on the shelves in the closet." Kolbaba estimated that he stood approximately eight feet from him. Kolbaba told the man to get out of there; he asked him to step outside and they would go to his house. The defendant was identified in court by Kolbaba as the man he saw in Sabadosh's house.

Kolbaba testified the defendant had a two-foot long metal bar wrapped in paper with a rope attached to it which he carried inside his pants. Kolbaba told him he would hang on to the bar while the defendant stepped outside through the window. When he first stuck his head in through the window, Kolbaba said he noticed something stacked up on the floor inside the window; he could not recall what type of items they were.

The defendant walked with Kolbaba to Kolbaba's house where Kolbaba asked his wife, while the defendant stood approximately 15 feet away, to call the police. The police arrived approximately 15 minutes later. Kolbaba noted that during this time, the defendant did not have to be physically restrained; Kolbaba handed the defendant a pencil and paper and had him draw down the instructions and the location where he would be. Kolbaba turned the metal bar over to police when they arrived. Sabadosh arrived approximately 35 to 45 minutes after the police.

On cross-examination, Kolbaba testified the defendant did not threaten him with the metal bar, and he did not attempt to run as they left Sabadosh's house and walked to Kolbaba's. He did not know who stacked the items near the window. On redirect, Kolbaba stated he was not familiar with the contents of the room, and that he had to ask the defendant a number of times to accompany him to his house.

Officer John Porter of the Kane County sheriff's office substan-

tially corroborated the previous testimony concerning the open window, which had no screen and no handle on the outside, the steel bar, which Porter said was covered with brown paper and had "strings" attached to it, and the two brown paper bags of items outside the rear door of the house. The bags contained various "junk" items: food containers, gloves, miscellaneous jewelry items. Porter estimated that the items were "not worth a lot [in] value." The bags belonged to the defendant. Porter testified they went through the house and checked the interior with Sabadosh.

Porter took the defendant in custody at Kolbaba's house and drove him to the county jail. On the way, the defendant made several statements. The defendant first stated the reason he was in the house was because he felt it was a friend's house and that he had stopped basically to see the friend. He did not then, nor ever, give Porter the name of the friend. In another statement, the defendant said he was on his way to Rockford, and that he once had a bicycle but had lost it somewhere to the east, possibly the River Forest police department. In another statement, he said he was going to Chicago and, in yet another, that he was going to the hospital. Porter testified it was "just a rambling statement, and none of [the defendant's] comments made any sense to [him]." The reason defendant gave for having the metal bar was for "canning"; he was crushing cans with it. Porter testified he observed no automobile or bicycle transportation for the defendant in the vicinity of the house. The defendant gave an address in Chicago as his residence.

On cross-examination, Porter testified that he found no evidence that the bar had been used to break into the house. Sabadosh informed Porter that none of his personal effects had been moved and that nothing was out of order. Porter testified the defendant did not resist, and he made no attempt to run.

On redirect examination, Porter stated that the defendant was handcuffed when he was taken into custody. On recross-examination, Porter stated he did not recall the defendant gave him any reason for being in the house other than that he thought it was a friend's house.

Following Porter's testimony, the defendant's motion for a directed verdict was denied, and, following deliberations, the jury returned with a verdict of guilty.

Included with the defendant's presentence report was his handwritten "Defendant's Version" of the incident which included criticism of the trial court:

> "To whom it may concern, I Mr. Jerry Ybarra Will go over the facts of this here situation, In other words, my case. I left

santa's village, when, *I came to a fork* up a 3/4's of a mile. I then took a right turn, to the first house, for info because *'I am not' of this town nor a resident.* However, the witness You understand, *Lied,* throughout the whole court procedures. I believe, that, you, of the court, and High eye-key Plaied a major role in your two-bite, low down, cut-dry, cut-throat deal. on my behalf. I am Innocent, of this case and I wash my hands, of this hedious, devious crime. *However, Why, must you play favoritism,* to Mr: Wechter [the prosecutor]: because, you felt sorry, and was taken by my lawyer, who kicked his ass in this here situation, Huh! What? I know, *when, 'I win'* and can take defeat like a man. But, when you see, this low-down, slimey, no good, two face, lowes of the lowes, scum of the earth. Cry like a little pussy. *because he cannot deal, or let alone, constructive critism.* A burglar, is a professional trade. And, I am proude of being one. In the event, that, I were one. How, In, Gods precious name, Can you say, that, and punk-out (Judge) If this country were England, I believe. I'll be free. My NAME IS LEGION. And You fucked up. big time, hot shot. kiss your ass good-by. or else. J.Y." (Emphasis in original.)

On September 27, 1985, a hearing was held on the matter of the defendant's comment. The court observed that it found nothing "too bizarre about his letter" and that it had received similar "criticism all the time in the past." The matter was continued to the following week on the issue of fitness.

On October 3, 1985, defense counsel argued that the defendant may not be fit for sentencing. An affidavit from staff psychologist Dennis Selvig of the Kane County jail was entered into evidence reflecting Selvig's determination that the defendant "was laboring under a personality disorder bordering on the psychotic" and that the condition may interfere with the defendant's ability to cooperate with his counsel. The defendant expressed dissatisfaction with his counsel, stating that his new attorneys, Messr. "Goldstein and Eistenberg," would soon make their appearance. The defendant then delivered an invective soliloquy against the prosecutor, replete with physical threats and four-letter words. The court advised the defendant to calm down, and the defendant apologized for his outburst. He stated he was experiencing some difficulty in coping with the situation. A fitness evaluation was ordered by the court. Prior to the end of the hearing, the defendant had another brief outburst, this time directed at defense counsel.

On October 17, 1985, psychiatrist F. Pierre Johnson testified that

although the defendant exhibited a personality disorder, it was his opinion the defendant was not psychotic and was fit for sentencing. The court found that the defendant was fit for sentencing, and defendant's motion for a new trial was denied. Following argument in mitigation and aggravation, the court sentenced the defendant to a term of imprisonment of seven years.

The defendant concedes he knowingly entered the residence without authority. He asserts, however, that his intent to commit a theft therein was not proved. He points to numerous details in evidence which he feels contradict any permissible inference of intent, and posits there is evidence of mental illness which further negates the requisite intent.

The general rules applicable to the instant offense were recently reiterated by this court in *People v. Sehr* (1986), 150 Ill. App. 3d 118, 122:

> "The offense of residential burglary has been stated to consist of 'entering, with or without force, any dwelling, during the day or night, with intent to commit a felony or a theft.' (*People v. Toolate* (1983), 115 Ill. App. 3d 13, 16, *rev'd on other grounds* (1984), 101 Ill. 2d 301.) 'The gravamen of the offense is the felonious intent with which the building is entered. [Citations.]' (*People v. Maffioli* (1950), 406 Ill. 315, 320; *In re L.F.* (1983), 119 Ill. App. 3d 406; *People v. Toolate* (1983), 115 Ill. App. 3d 13, 16, *rev'd on other grounds* (1984), 101 Ill. 2d 301.) Whether the requisite intent existed is a question for the trier of fact, and the decision of the fact finder will not be overturned on appeal unless the evidence is palpably contrary to the verdict or so unreasonable, improper, or unsatisfactory as to create a reasonable doubt of guilt. *People v. Morrison* (1983), 114 Ill. App. 3d 828, 830."

The rule regarding the issue of proof of the defendant's intent to commit theft was set forth in *People v. Johnson* (1963), 28 Ill. 2d 441, 443:

> "Intent must ordinarily be proved circumstantially, by inferences drawn from conduct appraised in its factual environment. *** *[I]n the absence of inconsistent circumstances, proof of unlawful breaking and entry into a building which contains personal property that could be the subject of larceny gives rise to an inference that will sustain a conviction of burglary.* Like other inferences, this one is grounded in human experience, which justifies the assumption that the unlawful entry was not purposeless, and in the absence of other proof, indicates theft

as the most likely purpose." (Emphasis added.) (See also *People v. Toolate* (1984), 101 Ill. 2d 301, 308; *People v. Fico* (1985), 131 Ill. App. 3d 770, 772-73; *People v. Snow* (1984), 124 Ill. App. 3d 955, 961.) " 'The felonious intent of an accused may be inferred from his words, action, violence and other conduct and it is within the province of the jury to consider all the facts and circumstances of the case in determining the question of intent.' *People v. Maffioli* [1950], 406 Ill. 315." *People v. Hansen* (1955), 5 Ill. 2d 535, 540.

Defendant points to these facts as "concrete indicia" that he had less than a felonious intent: no property was damaged save for two bent window nails; the metal bar was not used to effectuate the break-in; nothing was taken nor was any item of value even moved; no resistance was offered; no attempt to flee was made, and no one was threatened despite the defendant's ready access to the metal bar. He asserts that Kolbaba's characterization of him as "rummaging" through Sabadosh's closet, by itself, cannot be held to fulfill the necessary quantum of proof, particularly in light of his less than stable mental background and his untoward behavior in court.

■ Several of the facts highlighted by the defendant relate to the mildly destructive manner in which he entered the house and his nonviolent submission to others upon being discovered in the house. We do not view such facts necessarily to be circumstances "inconsistent" with his intent to commit theft. Apparently, it was unnecessary to use more than manual force to open the window in question, and, as the State suggests, the defendant may not have been prone to physical violence against others. The facts surrounding the offense were fully presented to the jury. It found he had the intent to commit theft, and we find the evidence in the record was not palpably contrary to that verdict.

The defendant here was found rummaging through items on the shelves of a closet in a room in the house. The window of the room was one which had no screen, was secured only by two small nails, and was not visible from Route 72. The window had been forced open, bending the nails. The two cats which had had "the run of the downstairs" when Sabadosh left in the morning were found in the basement, behind a closed door which the cats could not have opened and then closed again by themselves. Dusty footprints which were not Sabadosh's were found on the mats at the top of the stairs coming out of the basement. No other footprints were observed in the house.

As to these latter points, the defendant suggests in his reply that "the footprints and the meanderings of the house cats could have pre-

sumably been the result of the police investigation." However, it is not clear that the sergeant and auxiliary police officer who first responded to the scene were ever in the house prior to Sabadosh's return. According to Deputy Porter's testimony, "We had to await the arrival of the current tenant, Mr. Sabadosh." Porter further testified he examined the entire interior of the house, stating: "[W]e went through the house with the tenant and checked the interior with him."

■ Further, even assuming *arguendo* the truth of the defendant's proffered explanation that he believed the house was his friend's, we find such an explanation, without more, insufficient to rebut the inference of theft created by his unlawful entry. When the court in *People v. Toolate* (1984), 101 Ill. 2d 301, declined to find that breaking and entering could be used to infer an intent to commit "any other felony," it nevertheless clearly preserved the holding of *People v. Johnson* (1963), 28 Ill. 2d 441, 443, that in the absence of inconsistent circumstances, proof of unlawful breaking and entry "is sufficient to infer the intent to commit theft."

■ Contrary to the defendant's argument, we find the fact that nothing was taken or even moved does not present an inconsistent circumstance sufficient to raise a reasonable doubt of his guilt. First, Sabadosh testified it was difficult for him to determine whether anything had been taken or moved from the room in question due to its previously existing state of disarray. Second, although the fact property is taken is evidence that the requisite intent existed at the time of the entry (*People v. Snow* (1984), 124 Ill. App. 3d 955, 961), it is not necessary to prove that anything was taken in order to support a burglary conviction. "The gist of the offense of burglary is the entering of a building with a felonious intent, [citations] and the crime is complete whether or not anything is taken, [citations] *** ." *People v. Clark* (1964), 30 Ill. 2d 216, 219-20; *People v. Sansone* (1981), 94 Ill. App. 3d 271, 273.

■ In *People v. Sehr* (1986), 150 Ill. App. 3d 118, 123-24, we upheld the defendant's conviction for residential burglary, opining that nothing may have been taken or disturbed because the defendant was only in the house for a short time before he was discovered. Moreover, as here, the defendant in *Sehr* was on foot and quite likely had not yet found contraband which he felt was suitably portable. In *People v. Hancock* (1978), 65 Ill. App. 3d 694, the defendant's conviction for burglary was upheld, where although nothing was taken, doors and drawers were found open in the house. We do not find a significant distinction to be the fact that in both those cases the defendants

also attempted to flee whereas the defendant here did not. Defendant had a limited opportunity for a successful escape where Kolbaba was blocking the window, and even if he managed to break away, the surrounding area was wide open country and he was on foot.

In sum, we do not find the circumstances cited by the defendant rebut the inference that the defendant's unlawful entry into Sabadosh's house was for any purpose other than theft.

■■ ■ Defendant's further contention that there is evidence of mental illness which serves to negate the jury's finding that he possessed the requisite intent even though he did not offer an insanity defense is without merit. He cites *People v. Wetmore* (1978), 22 Cal. 3d 318, 583 P.2d 1308, 149 Cal. Rptr. 265, in support of his contention that evidence of mental illness is admissible and relevant to prove lack of intent. In that case, the reviewing court found the trial court erred when it refused to consider evidence of the defendant's "diminished capacity" in determining his guilt even though such evidence also tended to show defendant's insanity. As the State points out, however, none of the evidence of defendant's written or oral vituperative outbursts was presented to or observed by the jury. All of it occurred prior to and during sentencing. As stated in *People v. Collins* (1985), 106 Ill. 2d 237, 261:

> "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. As the United States Supreme Court observed in *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *** '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' (Emphasis in original.) 443 U.S. 307, 319, 61 L. Ed. 560, 573, 99 S. Ct. 2781, 2789."

*Accord People v. Hutson* (1985), 138 Ill. App. 3d 553, 556-57.

We reject defendant's suggestion that the phrase "all of the evidence" must be read so as to include the record of his bizarre post-trial actions. The text prefacing the quote in the original source, *Jackson v. Virginia*, clearly refers to "evidence at the trial." *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89.

Viewing the evidence adduced at trial in the light most favorable to the prosecution, we believe any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Accordingly, the judgment of the circuit court of Kane County is affirmed.

Judgment affirmed.

REINHARD and INGLIS, JJ., concur.