THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFFERSON COLEMAN, Defendant-Appellant.

First District (6th Division) No. 1—88—0300

Opinion filed September 7, 1990.—Rehearing denied October 9, 1990.

84

Michael J. Pelletier and Mitchell Katten, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Gael O'Brien, and Kenneth W. Goff, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, Jefferson Coleman, of two counts of armed robbery, two counts of unlawful restraint and one count of

residential burglary. The convictions for unlawful restraint and armed robbery were merged, and the defendant was sentenced to concurrent prison terms of 60 years for armed robbery and 15 years for residential burglary.

The defendant first contends that he was not proved guilty of residential burglary beyond a reasonable doubt. The two principal witnesses for the State were Charles Brown (Brown) and his wife Frederica. They testified that on May 11 at approximately 10:15 p.m., they were returning to their home from a Mother's Day celebration. When they reached the door to their garden apartment at 2112 North Bissell in Chicago, they heard someone say, "Stop, don't move." Turning toward the speaker, they noticed a man pointing a handgun at them. The area was lighted by a streetlight 30 to 40 feet away. They repeatedly asked the man what he wanted, and the man repeatedly demanded that they open their door. Brown asked his wife to give the man his wallet which she had in her purse. The man took the wallet, placed it in his coat pocket and continued to demand that they open their door. He then told them that he would shoot if they had not opened the door by the time he counted to three.

Frederica unlocked the door by the count of two and immediately turned on the lights inside the apartment. The man forcibly moved them into the apartment. They continued to ask him what he wanted. The man then told them to lie facedown on the floor. He ripped an extension cord out of the wall and used the cord to tie Brown's hands back to his ankles as he faced the floor. While he was tying Brown up, his gun discharged.

After the man had secured Brown, he asked Frederica the location of the bedroom; he told her to stand up and then pushed her with his gun toward the bedroom. Upon entering the bedroom, she immediately turned on the light. The man turned her around and sat her on the bed. He suddenly turned and left the room.

While the man was leading Frederica to the bedroom, Brown had been able to hop to the entrance-way of the apartment which was out of the defendant's sight. While Brown was attempting to free his feet, he heard the man run down the hallway. The two men struggled. Brown grabbed the man's left hand, which was holding the gun, and tried to point it towards the ceiling. With his feet still tied, he fell over. The man continued to point his gun at Brown, and Brown continued to reach up to grab it. The man eventually put the gun in his belt and fled from the apartment.

Frederica sat dazed for about 30 seconds after the man left the bedroom. While the man and her husband struggled, she locked the

bedroom door and called the police. The police arrived within minutes. Brown estimated that the entire episode lasted about five to seven minutes.

Both Brown and his wife gave the police a description of the man. Because their description was a joint effort, Brown could not remember exactly what he had told the police that night. He remembered describing the man as being 5 feet 10 inches or 5 feet 11 inches tall but he did not specifically remember how he had described the defendant's shirt.

Frederica specifically described the man as a black male, wearing a dark jacket, dark pants and shoes that had leather weaving on top, approximately 30 to 35 years old, 5 feet 10 inches to 5 feet 11 inches, with black hair, brown eyes, medium complexion, pock-marked face and a pointed jaw. At trial, she explained that when she said that he had a pock-marked face she meant that he appeared unshaven; he did not have a clean-kept face but had "short, curly hairs sort of not closely spaced over his cheeks fairly high on his face."

Officer Stanley Obos responded to a radio call of a robbery at 2112 North Bissell. He met Brown and his wife, who were very nervous and upset. Together, the two described the offender as a male black with black hair, pointed jaw, pock-marked faced, 5 feet 10 inches to 5 feet 11 inches tall and 150 to 160 pounds. They also said that the man was wearing a short leather jacket, dark shirt and pants and brown shoes with a mesh weave.

The wallet taken from Frederica contained various types of identification of Brown including a driver's license, some credit cards, an attorney registration or bar association card, a gun registration card, an Illinois State firearm owner's identification card, a couple of blank checks, a check made out to Brown and perhaps some cash.

Two days later Officers John Waterloo and Robert Lanning received an assignment concerning a forgery at the Continental Bank at 1165 North Clark Street. The officers arrested the defendant near the bank and subsequently booked him for forgery. A search of the defendant uncovered a brown wallet containing identification cards, credit cards and checks belonging to Brown. Lanning contacted Brown regarding the recovery of his wallet and asked him to come to the station. Brown then contacted his wife, and they each went to the 18th District police station. Brown later identified his wallet at trial, the gun registration card, the Illinois driver's license and the Illinois State firearm owner's Identification card. The defendant's photograph had been placed over Brown's on the driver's license and firearms' identification card.

Detective O'Leary conducted a lineup which included the defendant. The defendant chose his own position in the lineup; he stood second from the left. O'Leary had Brown and his wife view the lineup separately. They did not meet or talk to each other during the lineup. After initially viewing the lineup, Brown asked for a voice identification. Brown turned his back to the lineup, and after O'Leary changed the order of the participants, each participant was required to say, 'I am going to count to three, one, two, three." After hearing the participants speak, Brown identified the defendant. Frederica viewed the lineup first and also identified the defendant. Both Brown and his wife identified the defendant in court as the man who had robbed them. However, Frederica admitted that the defendant looked about 20 pounds heavier at trial than he did at the time of the incident; his body was much more developed, and he was clean-shaven.

The indictment charged the defendant with the offense of residential burglary in that he entered the dwelling place of Brown and his wife "with the intent to commit therein a theft." The defendant first maintains that the evidence failed to establish that he entered the Brown's residence with the intent to commit theft.

■■■ We believe that the State adequately proved both an unlawful entry and the requisite intent to sustain the defendant's conviction of residential burglary. Absent inconsistent circumstances, a fact finder may infer the requisite intent to commit theft from proof of an unlawful breaking and entering into a building when it contains personal property that could be the subject of larceny. (*People v. Johnson* (1963), 28 Ill. 2d 441, 192 N.E.2d 864.) The defendant argues that his act of entering the bedroom with Frederica rather than the living room or dining room was inconsistent with an intent to commit theft because, he maintains, objects of theft would more likely be found in the living room or dining room. This somewhat novel argument is similar to that made and rejected in *People v. Sehr* (1986), 150 Ill. App. 3d 118, 501 N.E.2d 848. In *Sehr*, the court noted that a "master bedroom seems a likely cache for such portable and desirable items as jewelry and currency." (150 Ill. App. 3d at 124.) It is more likely that Frederica would know the location of jewelry than would her husband. We reject the defendant's additional argument that an intent to commit theft may not be inferred because nothing was taken. (See *People v. Ybarra* (1987), 156 Ill. App. 3d 996, 510 N.E.2d 122.) It is reasonable to infer that events such as the discharge of the gun and the struggle with Brown prompted the defendant's flight before he was able to seize any property.

The facts clearly justify an inference that the defendant entered

the Browns' apartment attempting to commit theft. He confronted the Browns at gunpoint on their doorstep at 10 on a Sunday night. He entered their residence forcibly. Having received Brown's wallet upon Brown's own initiative, the jury could have reasonably inferred that the defendant recognized the Browns as easy victims and that he wanted more money or other valuables. It is also reasonable to conclude that the defendant tied up Brown to remove him as a threat and then took Frederica into the bedroom to aid him in locating easily transportable valuables. We conclude that the relevant surrounding circumstances including the time, place and manner of entry into the premises, the defendant's activity within the premises and the lack of any alternative explanation indicate that the defendant intended to commit a theft when he entered the apartment. *People v. Richardson* (1984), 104 Ill. 2d 8, 470 N.E.2d 1024.

The defendant next contends that reversible error occurred at the hearing on his motion to suppress the identifications. During the cross-examination of the Browns the judge sustained objections to the following questions:

"Q. What was the height of the individual that you [Brown] gave to the police [of the man] who accosted you?"

"Q. Did the individual whom you [Brown] *** identified in the lineup match the description of the individual which you gave to the police [on the night of the accident]?"

"Q. Do you [Frederica] recall giving a height identification to the police?"

The judge ruled that the questions were irrelevant unless the defendant could establish some impropriety or suggestiveness on the part of the police before the Browns made their identification.

The defendant relies on *People v. Robinson* (1970), 46 Ill. 2d 229, 263 N.E.2d 57, in which the court held that the factors to be considered in deciding whether an identification has been unduly influenced by unfair procedures include the prior opportunity the victim had to observe the alleged criminal act, the existence or absence of any discrepancy between any prelineup description and the defendant's actual description, the failure to identify the defendant on a prior occasion and any acquaintance with the defendant prior to the crime. One of the questions to which the court held an objection was improperly sustained was whether the witness had given a description to the police, and, if so, what was the description. It would appear that *Robinson* would be applicable here. However, in a later case, *People v. Garcia* (1983), 97 Ill. 2d 58, 454 N.E.2d 274, the supreme court explained its holding in *Robinson*:

"Defendant, referring us to *People v. Robinson* (1970), 46 Ill. 2d 229, asserts that the hearings were unfair because the trial judge precluded defense counsel from making an effective inquiry into the reliability of the witnesses' identification testimony by sustaining objections to questions designed to reveal whether there was any independent basis for the identifications. This argument, however, misapprehends the allocation of the burden of persuasion in a suppression hearing. Our decisions have made clear that the defendant must first establish that the pretrial identification procedure was unnecessarily suggestive and that the evidence will then be suppressed unless the State is able to show by clear and convincing evidence an independent basis of reliability. (*People v. McTush* (1980), 81 Ill. 2d 513, 520; *People v. Blumenshine* (1969), 42 Ill. 2d 508, 511. See *People v. Bryant* (1983), 94 Ill. 2d 514, 520.) The inquiry prescribed in *Blumenshine* and repeated in *Robinson*, mandating consideration of such factors as how well the witness was able to observe the criminal act, the accuracy of any description furnished by the witness, and whether the witness had been previously acquainted with the defendant, *is relevant only to evaluate the independent basis of reliability.* (See *People v. Bryant* (1983), 94 Ill. 2d 514; *People v. Hopkins* (1973), 53 Ill. 2d 452.) *The questions [including those concerning a previous description] were simply not relevant to the issue of whether the identification procedure had been unnecessarily suggestive,* and the trial judge did not deny defendant a fair hearing by sustaining objections to those inquiries." (Emphasis added.) 97 Ill. 2d at 73.

In *People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301, relied upon in *Garcia*, the supreme court held that identifications made under suggestive conditions are admissible if reliable. The court also held that the factors that it had previously said were relevant on the questions of suggestiveness in *People v. Robinson* were relevant on the questions of reliability. We conclude, therefore, under the later cases of *Bryant* and *Garcia* that the questions asked here were properly excluded in the absence of proof of suggestive preidentification procedures by the police.

The defendant asserts that he established such suggestive procedures in that, he claims, he was the only person in the lineup wearing a black shirt and that Frederica had told the police that the man was wearing a *dark* shirt at the time of the offense. The fact that the defendant was the only one wearing a black or dark shirt was not so

suggestive or prejudicial as to taint the identification. (*People v. Keane* (1970), 127 Ill. App. 2d 383, 262 N.E.2d 364.) It is apparent from the judge's ruling and findings that he found no evidence to support the defendant's claim that the identifications were the result of improper police procedures or unnecessary suggestiveness. Implicit in his findings is the conclusion that he found no significance in the fact that the defendant was wearing a black shirt. The defendant also contends that suggestiveness is apparent because, again he claims, Brown was shown the identification cards recovered from the defendant in which the defendant's picture had been imposed over Brown's picture before Brown viewed the lineup. That assertion is contrary to the record. Brown testified, as did one of the officers, that he was shown the pictures after viewing the lineup.

Finally, the questions that the defendant was prevented from asking on the motion to suppress were asked and answered at the trial. Both Brown and Frederica testified that they described the man as being 5 feet 10 inches or 5 feet 11 inches tall. (According to the record, the defendant is 5 feet 11 inches in height.) Moreover, the robber's height was the only part of the description Brown remembered making to the police. Consequently, no prejudice occurred to the defendant. See *People v. Williams* (1972), 52 Ill. 2d 455, 288 N.E.2d 406; *People v. Hine* (1980), 88 Ill. App. 3d 671, 410 N.E.2d 1017; *People v. Attaway* (1976), 41 Ill. App. 3d 837, 354 N.E.2d 448.

■ The defendant also contends that his identification by Frederica and Brown both at his pretrial lineup and at trial should have been suppressed because they were unreliable. He again argues that the lineup was too suggestive and that the witnesses failed to provide the police with a description which accurately described him. We reject the argument that the lineup was suggestive for reasons we have already discussed concerning the admissibility of evidence on the motion to suppress. Further, we do not find his attire to be so strikingly dissimilar from the other participants that it virtually assured his identification. *Cf. People v. Sykes* (1987), 161 Ill. App. 3d 623, 515 N.E.2d 253.

Frederica described the man as wearing a dark jacket, dark pants and shoes that had leather weaving on top. Contrary to the defendant's assertion here, during the lineup he was not wearing dark pants; they were gray pants. As a matter of fact, his pants are lighter than any one else's in the lineup. The police report indicated that one of the men in the lineup was 5 feet 9 inches, two of the men including the defendant were 5 feet 11 inches, one was 5 feet 7 inches and another 6 feet 1 inch. The police never told either Frederica or Brown

what man to pick out of the lineup. They never told them anything about any of the men in the lineup. They never told them from which man they had recovered Brown's wallet. Both Frederica and Brown viewed the lineup separately and did not meet or talk to each other during the identification procedure. The defendant chose his own position in the lineup. The order of the participants was changed after Brown requested a voice identification, and Brown made the voice identification with his back turned toward the lineup. In light of all these facts, we conclude there was ample evidence to support the admissibility of the out-of-court identification and the in-court identification.

The defendant next contends that he was denied effective assistance of counsel at sentencing and on his motion for new trial. Both the public defender and the defendant *pro se* filed post-trial motions for a new trial. The defendant alleged, among other things, that the public defender had ineffectively represented him at trial. He specifically alleged that his trial counsel failed to assert an alibi defense despite alibi witnesses; that he was prejudiced by the agreement of his counsel with the State to eliminate evidence which was vital to his case; and that his counsel engaged in a meaningless defense, giving scant attention to evidence and failing to make proper objections. His *pro se* motion also adopted the public defender's motion for a new trial which alleged pretrial, trial and post-trial errors. The trial judge granted the defendant's request for new counsel and continued the post-trial matters by agreement until counsel could be appointed. The judge subsequently appointed Dennis Born to represent the defendant on his post-trial motion. Born advised the judge that he had read the half-sheets on the case but requested a continuance to familiarize himself with the case. The judge granted his request and set post-trial matters for December 9, 26 days later.

On December 9, 1987, Born again requested the judge to continue post-trial matters. He advised the judge that he had not yet had the opportunity to familiarize himself with the case. He had been presented with approximately 400 pages of documentation, but he had been unable to obtain the official trial transcript. The judge said that he was not sure that a trial transcript was "absolutely necessary"; however, he thought that it had already been ordered. He was anxious to hear post-trial matters and to proceed with three remaining cases against the defendant. Born advised the judge that he had spoken with trial counsel and that the necessity for a transcript might be obviated. The judge granted the request for a continuance and set the post-trial matters for hearing on December 23, 1987.

At the hearing on December 23, Born again informed the judge that he had spoken to trial counsel. The defendant testified that he originally had been represented by an assistant public defender named Carothers; later he was represented by an assistant public defender named Kathleen O'Leary; and later he was represented by Assistant Public Defender Donna Foley. On the day the trial began he was also represented by an assistant public defender named Ptacek. He said that he did not trust Ptacek or Foley. He said he did not like Foley because they "could never see eye to eye on the case at all, and she wanted to proceed in a different manner." On cross-examination he said that Foley wanted to "eliminate certain evidence received that [he felt] was vital." That evidence was the description of himself that the witnesses had given that was totally different from his own. When he was asked by the State's Attorney what other evidence he might be talking about he said the following:

"A. Description didn't match me at all totally, and even one person that is supposed to come in for me didn't even show up, and the person, Miss Higgins, never showed up, and she couldn't make a description."

Later in the cross-examination the following occurred:

"[STATE'S ATTORNEY]: Isn't it a fact [that] the testimony that was favorable to you is the eyewitness of Kathleen Higgins, who is the victim in another case that is still pending in this case?

A. I'm sorry, I didn't say testimony was favorable, to be favorable, I didn't say that.

Q. But that testimony is in fact from a victim in a case that is still pending against you, is that not true?

A. Yes."

He testified that he had provided Foley with witnesses for an alibi. When asked the names of the witnesses and their addresses, he said that he did not know. Later he said that the name of one of them was "Kimberly Barnes, which was co-defendant." He said he had a man named "Kelly, guy stayed over at the house. I don't know his full name. I had it wrote down, and my aunt Mary Foster." He gave Foley the names and addresses of those persons. When he was asked whether to his knowledge she had spoken to the individuals he said the following:

"A. She did. She had made one phone call and she got negative response from one of my aunts, and as far as getting in contact with the other ones, and she didn't do anything that I know of."

Edward Ptacek was called by the State and testified that Anita Carothers and Kathleen O'Leary had left the public defender's office and had entered private practice. During the time that Carothers and O'Leary had been assigned to that courtroom, Donna Foley was the lead public defender in the courtroom. It was brought to his attention that the defendant was having problems with Foley as far as her representation was concerned. He came into the case to assist her in the trial. The relationship between the defendant and Foley was "strained." There was some incident between the defendant and Foley that caused her to express concern as to her representation. The incident to which he referred was one in which the defendant made some threats against Foley.

Foley testified that the defendant had given her names of witnesses and that she had checked them out. She determined that they could not assist her in establishing an alibi defense. One person was deceased, another person she was able to find but that person would not have been an alibi for "this particular time." She went to her superiors about representing the defendant because she did not feel that he was cooperating with her. Questions by the judge established that at the time she began to represent the defendant she was aware that he had other matters pending. The State moved to try the defendant on a forgery and burglary charge together with the armed robbery of the Browns. Foley resisted that motion successfully. The suggestion was made that Kimberly Barnes was a fugitive.

To abbreviate, the defendant's argument on this point is that Born was incompetent because he did not take sufficient steps to establish the incompetence of Foley and Ptacek. We have examined the entire record, and we find no incompetence on the part of Born or on the part of Foley and Ptacek. Born did everything that could reasonably be expected of him. A reading of the transcript would have shown Born, as it shows us, that Foley and Ptacek cross-examined the State's witnesses and argued as effectively as they could under the circumstances. This was a relatively simple case, but a strong one for the State. Not only did two persons make positive identifications but the defendant had in his possession the evidence which overwhelmingly corroborated the identification—the proceeds of the robbery. The defendant does not offer any plausible explanation his attorneys might have advanced for his possession of Brown's identification to which the defendant had attached his own picture.

■ Ironically, what the defendant urged as a ground of Foley's incompetence was her successful effort to prevent proof of another crime. His other claim of incompetence is the failure to call his al-

leged alibi witnesses, one of whom was dead, one apparently was a fugitive and the last could not establish an alibi. He made no attempt to show the judge what any of those witnesses would prove. He made no showing himself at the post-trial hearing that he had an alibi. Under these circumstances the judge correctly denied the post-trial motion based on the alleged incompetence of trial counsel. Similarly, we reject the defendant's claim that he established inadequate representation on the part of Born at the post-trial motion.

The defendant next contends that the case should be remanded for resentencing because he received ineffective assistance of counsel at his sentencing hearing. At the sentencing hearing the State argued that the defendant was eligible for an extended term because of the nature of the offense against the Browns and because he had previously been convicted of murder in 1975 and sentenced to 14 to 18 years' imprisonment. The record also shows that he had received six month's probation in 1972 for possession of marijuana and in 1985 he received one year's probation for retail theft. Born argued that the judge should not impose an extended term and that the judge could sentence the defendant under the Class X provision of the statute to a term of from 6 to 30 years and that any sentence within that period would be sufficient. He argued that the evidence did not show heinous and brutal conduct on the part of the defendant.

The defendant was given an opportunity to address the court. In substance he said that the witnesses were mistaken and that he was not the man who had robbed them. The judge then expressed his view of the offense and the defendant's background. He pointed out that the defendant had already been convicted of the most serious crime defined by the legislature. He felt that, judging from the defendant's character and attitude, he would be likely to commit other crimes.

■ The defendant's claim is based again on the failure of Born to read the trial transcript and on Born's failure to introduce evidence in mitigation. Implicit in the defendant's argument is that the trial transcript would disclose something in mitigation. The defendant, who now has the transcript, does not refer us to anything in the record which would rebut the contentions of the State's Attorney or the findings of the judge with respect to the evidence heard at trial. Consequently, we conclude that reading the record would not have added anything to Born's ability to advocate for his client at sentencing.

With respect to the alleged failure of Born to submit anything in mitigation, we note that Born told the court that the defendant had given him the names of three individuals. He was given only the first name of one of the individuals. He told the court that he had at-

tempted to contact those individuals and that they had not responded to his phone calls. The defendant argues that he suffered a complete lack of representation because Born failed to argue evidence in mitigation contained in the presentence investigation report. Born's failure to argue these facts is not prejudicial because the court's knowledge of them can be presumed. First, the judge himself suggested that the presentence investigation report be updated before sentencing and the report was subsequently made part of the record. Second, the defendant himself advised the court of many of the facts contained in the presentence report. Based on these facts, the record does not support the defendant's assertion that he suffered from a complete lack of representation at the sentencing hearing. The record strongly suggests that nothing Born could have done would have changed the judge's conclusion that the defendant should be imprisoned for a substantial period of time.

The defendant next maintains that the jury was improperly instructed because it was not expressly instructed on the mental state required to commit armed robbery.

■ The jury was given Illinois Criminal Pattern Jury Instructions numbers 14.01 and 14.02. Jury instruction No. 14.01 informed the jury of the elements of armed robbery as defined in the Criminal Code of 1961. (Ill. Rev. Stat. 1985, ch. 38, pars. 18—1, 18—2.) Instruction No. 14.02 expressly informed the jury that the prosecution had to prove beyond a reasonable doubt each element of armed robbery, as defined by the statute. The armed robbery statute does not explicitly include a mental state, and neither the definition nor issue instructions refer to a mental state or to the burden of proof regarding a mental state.

■ The defendant contends that, nevertheless, as a matter of Illinois law, a mental state is an essential element of armed robbery on which the jury must be expressly instructed. He reasons that, under section 4—3(a) of the Criminal Code, a person is not guilty of an offense, except one involving absolute liability, unless he acts either with intent (Ill. Rev. Stat. 1985, ch. 38, par. 4—4), knowledge (Ill. Rev. Stat. 1985, ch. 38, par. 4—5), recklessness (Ill. Rev. Stat. 1985, ch. 38, par. 4—6) or negligence (Ill. Rev. Stat. 1985, ch. 38, par. 4—7). Because armed robbery is not an absolute liability offense, the defendant argues that section 4—3(a) dictates that a mental state requirement is incorporated into the definition of armed robbery and, therefore, he concludes that the defendant's mental state is an essential element of the offense. The precise argument advanced by the defendant was made and rejected in *People v.*

*Avant* (1989), 178 Ill. App. 3d 139, 532 N.E.2d 1141, and *People v. Talley* (1988), 177 Ill. App. 3d 170, 531 N.E.2d 1139. In *Talley* the court pointed out that robbery is a general intent crime, citing *People v. Banks* (1979), 75 Ill. 2d 383, 388 N.E.2d 1244. The court concluded that commission of a general intent crime such as robbery implies an intent or knowledge. Consequently, it was not error to omit the implied mental state from the issue instructions. The *Avant* case followed *Talley* and rejected the argument of the defendant, which is the same argument made here, that the failure to instruct the jury as to mental state was a violation of Federal law. We follow the reasoning and conclusions of *Avant* and *Talley* and hold that no error occurred in instruction of the jury.

The defendant next maintains that the judge abused his discretion when he failed to hold a hearing on whether Foley could continue to effectively represent the defendant, when he failed to appoint substitute counsel and when he denied Ptacek's request for a continuance.

On July 2, 1987, Assistant Public Defender Foley filed the defendant's motion to suppress identification. After at least five continuances, the court set the defendant's motion for hearing and the case for trial on Friday, October 2, 1987. Just before the hearing on the defendant's motion, Foley's supervisor, Edward Ptacek, advised the court that Foley wished to withdraw from the case because of a "personality clash" with the defendant. Ptacek requested that he be allowed to take over the defense, and he further advised the court that, although the defendant had "some reservations" about Foley's representation, he did not object to Ptacek's representation. Finally, Ptacek requested a one month's continuance to familiarize himself with the case. The State did not object to either request.

Without further discussion or argument, the trial judge denied Foley's request to withdraw; and, although he permitted Ptacek to act as additional counsel, he denied Ptacek's request for a continuance. In ruling on Ptacek's request, the trial judge stated as follows:

"All right, this case has been set with subpoenas for the last six times, since July ***. As far as I'm concerned, the State has witnesses here. *** We are going to proceed with the motion ***. I am sorry, but I am not going to allow a defendant, in effect, to frustrate the wheels of justice *** because they grind them very slowly in this case, back as far as June.

Mr. Jefferson Coleman filed a motion for appointment of Counsel, other than the Public Defender. We had a hearing on that. That was denied. He will have to get along with whoever is available to get along with on these motions. I am not going

to delay proceedings any longer. We are going to have the hearing today."

The judge then heard the defendant's suppression motion. After denying the motion, he set jury selection for the following Monday, and trial began one day later.

The defendant treats Foley's "personality clash" as a "conflict of interest" and argues that the trial judge had the responsibility to investigate the nature of the conflict and to cure its ill-effect. Relying on *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173, the defendant argues that once the trial judge was advised of Foley's probable conflict, it had the duty either to appoint new counsel or to take adequate steps to ascertain whether the risk of conflict sufficiently warranted new counsel. The defendant's reliance on *Holloway*, which is factually distinguishable, is entirely misplaced. Unlike *Holloway*, this case does not involve multiple representation by a single court-appointed attorney confronted with the risk of representing conflicting interests.

More important, we find no evidence to indicate that the trial judge was properly advised of any potential "conflict of interest" on the part of Foley. We find no authority which will permit us to equate a "personality clash" between an attorney and his client with a "conflict" or "potential conflict of interest" as recognized under Illinois law. See *People v. Spreitzer* (1988), 123 Ill. 2d 1, 525 N.E.2d 30 (reviewing relevant law concerning conflict of interest cases in Illinois).

 Because we do not find that the pretrial motion of Ptacek presented a "conflict of interest" and the trial did not disclose any such conflict, a reversal of the defendant's conviction depends upon whether he can demonstrate prejudice. (See *Spreitzer*, 123 Ill. 2d at 18-19.) The defendant has not demonstrated that his defense was prejudiced in any way. The fact that he had "some reservations" about Foley's representation is not dispositive. The fact that he did not get along with Foley did not entitle him to new counsel absent evidence that his defense would be adversely affected. In our judgment, to hold that the law requires appointment of a lawyer with whom an indigent defendant never disagrees or with whom he never has a "personality clash" would gut the orderly administration of the procedures governing appointment of counsel in criminal cases.

 Further, we are aware of the judge's belief that the defendant, in effect, was attempting to frustrate the already slow-moving "wheels of justice." A defendant cannot exercise his right to have counsel appointed merely to delay trial. (*People v. Hall* (1986), 114 Ill. 2d 376, 499 N.E.2d 1335.) We note that the judge was conscious of

the defendant's earlier attempt to have new counsel appointed and was aware of additional indictments still pending against the defendant at the time of trial. The judge was properly concerned about the length of time it was taking to dispose of this case. It is within the sound discretion of the trial judge to decide, on a case-by-case basis, when a defendant's right to select counsel unreasonably interferes with the orderly process of justice. (*People v. Terry* (1988), 177 Ill. App. 3d 185, 523 N.E.2d 568; see also 107 Ill. 2d R. 13(c)(3) (the court may deny a motion to withdraw if granting it would delay the trial or would otherwise be inequitable).) We believe that the trial judge well considered the defendant's situation and the quality of Foley's representation. Therefore, we do not believe that the judge abused his discretion when he denied Foley's motion to withdraw without holding a hearing as to whether he should appoint substitute counsel.

Turning to the defendant's contention that the trial judge abused his discretion when he denied Ptacek's request for a one-month trial continuance, we conclude that the record fails to show an abuse of discretion. The decision to grant or to deny a continuance is completely within the trial judge's discretion and will be determined by the facts and circumstances in each case. (Ill. Rev. Stat. 1985, ch. 38, par. 114—4(e); *People v. Friedman* (1980), 79 Ill. 2d 341, 403 N.E.2d 229; *People v. Spurlark* (1978), 67 Ill. App. 3d 186, 384 N.E.2d 767.) The movant's diligence, the defendant's right to a speedy, fair and impartial trial and the interests of justice are among the factors to be considered in making the decision. (*Friedman*, 79 Ill. 2d at 347; *Spurlark*, 67 Ill. App. 3d at 202.) A court may also review the history of the case. (*People v. Dunigan* (1981), 96 Ill. App. 3d 799, 421 N.E.2d 1319.) In this case, the trial commenced after a somewhat tortuous history which began in mid-May 1986. Discovery was completed in mid-June and trial was continued from time-to-time by agreement to late July 1987. Ptacek's request for continuance came on the day of trial despite the fact that the defendant's relationship with Foley became "rocky" well before the eve of the trial. Clearly, the trial court properly considered the defendant's right to a speedy trial and the movant's lack of diligence in presenting his request.

Further, we will not reverse a trial judge's denial of additional time absent a clear abuse of discretion. (*People v. Hayes* (1972), 52 Ill. 2d 170, 287 N.E.2d 465.) We cannot find an abuse of discretion without the defendant having shown that he was prejudiced by the court's denial. (*People v. Latimer* (1966), 35 Ill. 2d 178, 220 N.E.2d 314.) The record indicates that neither the defendant's case nor his rights were prejudiced by the denial of a continuance. Contrary to the defendant's

assertion, the record does not show that the judge's denial prevented Ptacek from taking over the case, forcing Foley to dominate the defense. Foley's representation was limited to arguing the defendant's motion to suppress, to presenting an opening statement and to cross-examining one witness.

The record does not reveal that Ptacek exhibited either a lack of knowledge or effectiveness due to the time in which he had to examine the case before trial. The trial was not complex; Ptacek was an experienced criminal defense attorney; and, as Foley's supervisor, he already had at least fundamental familiarity with the case. The record demonstrates that he appeared to be thoroughly prepared and conducted a vigorous defense with adequate skill. Ptacek cross-examined all but one of the six witnesses, interposed objections when appropriate, argued jury instructions and offered a more than adequate closing argument. Under the circumstances, we do not find an abuse of discretion in the judge's denial of the motion for continuance. See *People v. Killings* (1986), 150 Ill. App. 3d 900, 501 N.E.2d 1363.

The defendant's last contention is that he was denied his statutory right to a speedy trial. The defendant failed to raise this issue either before the trial, at trial or in his *pro se* motion for a new trial. After several briefs in this case were filed, including one *pro se* brief by the defendant, he filed another *pro se* brief asserting his right to a statutory discharge for the State's failure to provide him a speedy trial and attacking the effectiveness of his trial and appellate counsel for their failure to raise a speedy trial issue.

A defendant does not have the right to representation both *pro se* and by appointed counsel. (*People v. Lighthall* (1988), 175 Ill. App. 3d 700, 530 N.E.2d 81.) Under the circumstances we would be justified in striking the defendant's *pro se* supplemental brief raising this issue. However, to put the matter to rest, we deem it appropriate to address the question.

Appointed counsel is not obliged to brief every conceivable issue on appeal and will not be adjudged incompetent when he refrains from raising those issues believed to be meritless unless the appraisal is patently wrong and thereby clearly prejudices the defendant. *People v. Barnard* (1984), 104 Ill. 2d 218, 470 N.E.2d 1005.

The record shows that the defendant was arrested on May 13, 1986. The indictment was returned two weeks later. The defendant escaped from the county jail. On February 25, 1987, he was apparently rearrested. He was arraigned on February 27, 1987, and the case was continued by agreement at least nine times until September 1, 1987. The trial began on October 5. Therefore, assuming the cor-

rectness of the common law record, the statutory period began on September 1, and the defendant was brought to trial within the 120-day statutory term. Consequently, there is no showing of ineffective assistance on the part of trial counsel or appellate counsel.

For all these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.